[L. A. No. 10654. In Bank.—December 31, 1930.]

E. B. JONES et al., Appellants, v. CITY OF LOS AN-
GELES (a Public Corporation) et al., Respondents.

Woodruff, Musick & Hartke, Roy A. Linn, Harmel L. Pratt and Walter W. Rennie for Appellants.

Edwin P. Werner, City Attorney, and Frederick von Schrader, Deputy City Attorney, for Respondents.

LANGDON, J.—This is an action to enjoin the enforcement of a zoning ordinance of the City of Los Angeles. The said ordinance was enacted independently of the general zon-

ing plan of the city, and its restrictive provisions are directed toward one type of business. It provides that outside of certain designated districts, it shall be unlawful for any person, firm or corporation "to erect, establish, operate, maintain or conduct any hospital, asylum, sanitarium, home, retreat or other place for the care or treatment of insane persons, persons of unsound mind, or persons affected by or suffering from mental or nervous diseases". Penalties of fine and imprisonment are specified for its violation.

In March, 1927, the City of Los Angeles annexed the territory known as the Mar Vista District. At that time, there were already in operation in this district four sanitariums for the treatment of nervous diseases: the Casa Del Mar Sanitarium, the Marshall Manor Sanitarium, the St. Erne Sanitarium, and the Wittman Home for Children. These institutions take as patients only persons suffering from the milder forms of mental disorder. No insane persons are admitted. Each institution has been established by a substantial investment in land, buildings and equipment.

The above-mentioned zoning ordinance, adopted on August 11, 1927, some months after the annexation of the Mar Vista District, excluded that territory from the area in which the establishment and maintenance of such sanitariums was permitted. When the ordinance went into effect, plaintiffs, as the owners of the institutions, sought to enjoin its enforcement. The Superior Court of Los Angeles County, in each of the actions, denied the relief prayed for, and appeals were then taken. Because their grounds are practically identical, the four appeals were, by stipulation, consolidated, and will be considered together in this opinion.

A preliminary question which may readily be disposed of relates to the availability of the equitable remedy. ▬ It is settled that where a penal statute causes irreparable damage to property rights, the injured party may attack its constitutionality by an action to enjoin its enforcement. (*San Diego Tuberculosis Assn.* v. *East San Diego,* 186 Cal. 252 [17 A. L. R. 513, 200 Pac. 393]; *Abbey Land Co.* v. *San Mateo,* 167 Cal. 440 [Ann. Cas. 1915C, 804, 52 L. R. A. (N. S.) 408, 139 Pac. 1068].) Hence, if the ordinance is unconstitutional in its application to these plaintiffs, they are entitled to the decree which they seek.

Viewing the ordinance as part of a general zoning plan, and disregarding for the moment the question of its applicability to plaintiffs, there can be no doubt of its validity. ■ That zoning ordinances, when reasonable in object and not arbitrary in operation, constitute a justifiable exercise of police power, is now well established; and it is equally well established that the power extends to the regulation of uses of property which do not actually amount to nuisances. As Mr. Justice Lennon said in *Miller* v. *Board of Public Works,* 195 Cal. 477, 487 [38 A. L. R. 1379, 234 Pac. 381, 384]: " . . . the police power as evidenced in zoning ordinances has a much wider scope than the mere suppression of offensive uses of property . . . it acts not only negatively but constructively and affirmatively for the promotion of the public welfare." And in *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 387 [54 A. L. R. 1016, 71 L. Ed. 303, 47 Sup. Ct. Rep. 114], we find a similar statement: "Building zone laws are of modern origin. . . . Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. . . . And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation." (See, also, Baker, Legal Aspects of Zoning, p. 113; Bettman, Constitutionality of Zoning, 37 Harv. L. Rev. 834, 837.)

■ The evidence shows and the lower court found that the restricted districts were mainly residential in character. This is sufficient to justify the exclusion of businesses such as that carried on by plaintiffs. The decisions uphold the validity of ordinances excluding from residential districts property uses much less incongruous than these, as, for example, flats, stores and business buildings. (See *State* v. *Houghton,* 164 Minn. 146 [54 A. L. R. 1012, 204 N. W. 569]; *Ware* v. *Wichita,* 113 Kan.. 153 [214 Pac. 99]; *State* v. *New Orleans,* 154 La. 271 [33 A. L. R. 260, 97 South. 440]; *Spector* v. *Building Inspector,* 250 Mass. 63 [145 N. E. 265].)

 · The objection most vigorously urged by plaintiffs is that the ordinance violates the constitutional guarantee of equal protection of the laws in that the classification of permitted and prohibited districts is arbitrary and unreasonable. It is not contended, nor could the contention be made, that the permitted zones are too small or unsuited to plaintiffs' businesses. The permitted districts cover considerably more than one-third of the area of the city and include the downtown business district, as well as various other built-up sections. Hence the instant case does not come within the principles of those decisions which hold an ordinance discriminatory where it makes the permitted area unreasonably small. (See *In re White,* 195 Cal. 516 [234 Pac. 396].) It appears, however, that in the permitted districts are certain densely populated areas, and in the prohibited districts there is some territory which is sparsely populated. This is attacked as discriminatory, chiefly on the authority of *In re Throop,* 169 Cal. 93 [145 Pac. 1029], *Curtis* v. *Los Angeles,* 172 Cal. 230 [156 Pac. 462], and *In re Smith,* 143 Cal. 368 [77 Pac. 180]. The first of these cases was concerned with the use of a stone crusher; the second with stables, and the third with gas works. They are representative of the older group of decisions dealing with the power of a municipality to prohibit or regulate the conduct of businesses which are in the nature of public nuisances. To test the validity of zoning legislation by the strict language of some of the nuisance cases would be to ignore the change in both legislative and judicial views on this subject, a change which has been remarked upon by a number of authorities. (See *Miller* v. *Board of Public Works, supra; Village of Euclid* v. *Ambler Realty Co., supra; State* v. *Houghton, supra.*) It cannot be seriously contended that relative density of population in the permissive and restricted districts is a controlling test of the validity of a zoning plan, so far as the claim of discriminatory classification is concerned. The object of the present ordinance is to exclude hospitals for the treatment of insanity and nervous diseases from those districts which are devoted to residential purposes, because it is in such districts that they adversely affect the public welfare. This being so, it is immaterial whether the restricted district is densely or

sparsely populated, if it is residential. The ordinance is concerned with the nature of the district. A growing residential area is as reasonable an object of protection as one which is fully built up. On the other hand, while the permitted districts include some territory which is densely populated, that territory is not residential in character. It is devoted to business purposes and hence requires none of the special regulation deemed desirable to foster and protect the development of homes and the maintenance of a proper environment for children. Moreover, the argument of plaintiffs, carried to its logical conclusion, would destroy the usefulness of zoning ordinances· as an effective means of city planning, for it would require an examination of the regulation solely on the basis of present conditions. But zoning legislation looks to the future. It is a constructive movement in municipal legislation and, as such, it has received the approval of our courts. (*Miller* v. *Board of Public Works, supra; Zahn* v. *Board of Public Works,* 195 Cal. 497 [234 Pac. 388].)

An appellate court should not permit itself to be drawn into a minute examination of alleged discriminatory operation of such ordinances if, broadly considered, a reasonable basis of classification exists. (*Zahn* v. *Board of Public Works, supra;* Bettman, Constitutionality of Zoning, 37 Harv. L. Rev. 834, 850.) Bearing in mind the object of the ordinance and the findings of the court, we are satisfied that no unconstitutional discrimination has been made.

We have thus arrived at this conclusion: The ordinance in question, in so far as it prohibits the establishment of hospitals for the treatment of nervous diseases in certain districts in the City of Los Angeles, and permits their establishment in other specified districts, is valid. The businesses so restricted are proper subjects of such regulation, and hence the ordinance does not result in a denial of due process. The classification of districts is reasonable and not arbitrary and therefore there is no denial of equal protection of the laws. This much is clear, we feel, with respect to the *establishment of new businesses* of this character in the prohibited districts. But does the same result necessarily follow with regard to existing businesses in these districts?

In other words, does the broad view of the police

power which justifies the taking away of the *right to engage in such businesses* in certain territory, also justify the *destruction of existing businesses?* We do not think that it does.

We have already emphasized the fact that courts, in their consideration of zoning legislation, have not deemed themselves bound by their prior decisions on the legislative regulation or prohibition of nuisances. They have recognized that the right to use private property may be restricted by an ordinance which follows a reasonable plan, even though the use is neither a nuisance *per se*, nor a menace to health, safety or morals in the particular district from which it is excluded. It would seem, therefore, at first glance, that the zoning decisions reach the conclusion that businesses may be prohibited in the sense of being excluded from specified districts, although they do not come within any reasonable view of what constitutes a nuisance. An examination of those decisions, however, reveals the fact that nearly all of them deal with the attempt to establish businesses in the prohibited areas. They decide nothing more than this: The right to engage in a lawful and not dangerous business in a certain area may be taken away in pursuance of a reasonable zoning scheme. They do not decide that an established and not dangerous business, operating in a lawful manner in a certain territory, may be eradicated in pursuance of a reasonable zoning scheme. That problem, which is the important problem of this case, has, so far as we are aware, only been squarely presented to appellate courts in a few instances. The reason for the paucity of decisions is illuminating: Zoning laws have almost invariably been prospective in nature. Indeed, in some states, including Kansas, Ohio, Wisconsin, Illinois, Massachusetts, Maine and New Hampshire, the enabling statutes which give the zoning power to municipalities expressly provide that no retroactive ordinances shall be passed. (See Baker, Legal Aspects of Zoning, p. 158, note 220.)

As a matter of practice, also, those who have drafted ordinances have usually proceeded with due regard for valuable, vested property interests, and have permitted existing, nonconforming uses to remain. They are very generally agreed that the destruction of an existing nonconforming use would be a dangerous innovation of doubtful consti-

tutionality, and that a retroactive provision might jeopardize the entire ordinance. "Zoning . . . holds that an ounce of prevention is worth a pound of cure and that it is fairer to all concerned to prevent the establishment in residence districts of objectionable businesses than to drive them out once they were established. . . . Zoning looks to the future, not the past, and it is customary to allow buildings and businesses already in the district to remain, although of a class which cannot be established. If such a business constitutes a nuisance, it can still be removed under the police power, but the zoning acts in themselves do not customarily interfere with existing conditions." (Chamberlain and Pierson, Zoning Laws and Ordinances, 10 Am. Bar Assn. J. 185.) "Retroactive operation of the provisions of the ordinance is generally avoided. . . . " (Bettman, Constitutionality of Zoning, 37 Harv. L. Rev. 834, 853.) "Retroactive zoning is not to be recommended. . . . " (Young, City Planning and Restrictions on the Use of Property, 9 Minn. L. Rev. 593, 628.) "The purpose of zoning, which is said to be the crystallization of present conditions and the constructive control of future development, does not require that existing uses be changed. Hence it has been generally assumed that any attempt to make zoning ordinances retroactive would meet with the opposition of the courts and might result in their declaring the ordinance as a whole unconstitutional." (Retroactive Zoning Ordinances, 39 Yale L. J. 735, 737.) "Nonconforming uses may be required to be removed, but the majority of the cases seem to indicate that if this procedure is attempted the ordinance will be declared unconstitutional because unreasonable." (Byrne, The Constitutionality of a General Zoning Ordinance, 11 Marquette L. Rev. 189, 214.) (See, also, Baker, *supra,* p. 145.)

These same views have been expressed in a number of decisions. In *Pelham View Apartments, Inc.,* v. *Switzer,* 130 Misc. Rep. 545 [224 N. Y. Supp. 56], a building permit had been issued for the erection of an apartment house, and the petitioner had borrowed money, bought property, prepared plans, and begun construction, in reliance upon the permit. Thereafter, a new zoning law was enacted, under which such a permit could not be granted, and an attempt was made to revoke it. The court said: "While it is unfor-

tunate that the erection of this apartment house may be distasteful to people living in the neighborhood, and while perhaps it is unfortunate that their property should be thus affected, yet the protection of such rights must be legally done, and the public officials representing the people cannot legally be permitted to change the zoning law and cancel a permit previously issued under the original zoning act, where an innocent purchaser of real estate has in good faith acted upon such official action of the city, and has thereby acquired vested rights under his permit. . . . It would be nothing short of confiscation, and a complete disregard of constitutional rights, if a municipality could revoke a building permit issued under the conditions as presented in this case.'' (See, also, *People* v. *Stanton,* 125 Misc. Rep. 215 [211 N. Y. Supp. 438].)

In *Atkinson* v. *Piper,* 181 Wis. 519 [195 N. W. 544], retroactive legislation of this type was strongly disapproved, and the court construed the particular act as prospective in its operation, although the buildings in question were only in the process of construction. The Wisconsin court made a similar decision in the later case of *Rosenberg* v. *Village of Whitefish Bay,* 199 Wis. 214 [225 N. W. 838], where construction was not yet under way, but the owner of the land had incurred expenses in the preparation of plans for the structure.

In holding another statute not to be retroactive, the New Jersey court said in *Frank J. Durkin Lumber Co.* v. *Fitzsimmons,* (N. J. Err. & App.) 147 Atl. 555, 558: '' . . . may a municipality, without making compensation, estop an owner from continuing a use that is in actuality, that was begun and continued lawfully, and that becomes unlawful only because the municipality has so ordained? . . . Recognizing that the granting of a permit and the subsequent beginning of work thereunder do clothe the owner with certain rights against municipal interference, this court very recently, in two instances, refused a municipality the privilege of revoking a permit theretofore given. . . . It seems that a logical application of the same principle is to recognize *the right to continue, as against subsequent zoning interference, a use that was actually instituted,* that was lawful when instituted, and that has been actively and constantly maintained.'' (Italics ours.)

In *Adams* v. *Kalamazoo Ice & Fuel Co.*, 245 Mich. 261 [222 N. W. 86, 87], the court said: "The ordinance excepts from its restrictive provisions, existing nonconforming uses, but even if it did not contain such an exception, we cannot hold its restrictions retroactive though defendant, anticipating its enactment, purchased the property and placed its small distributing building thereon. Threatened invasion of a residence district by business may be an impelling reason for affording protection by way of a zoning ordinance, *but such an ordinance may not operate to remove businesses found there.*" (Italics ours.)

In response to the charge that exemption of existing nonconforming uses would be discriminatory, the courts have very generally held the exemption to be valid and necessary. (Baker, *supra*, p. 144.) As the court said in *City of Aurora* v. *Burns*, 319 Ill. 84 [149 N. E. 784, 788]: "The building zone ordinance . . . permits lawful uses of buildings at the time of the passage of the ordinance, although not in conformity with its provisions, to continue thereafter. This exception is made so that the ordinance shall not have a retroactive operation. It would be manifestly unjust to deprive the owner of property of the use to which it was lawfully devoted when the ordinance became effective." In *Spector* v. *Building Inspector*, 250 Mass. 63 [145 N. E. 265, 268], the same conclusion is reached: "To exempt buildings already devoted to a use from a prohibition of such use of other buildings or buildings thereafter erected in a specified area is not unequal but lawful." This court has also spoken to the same effect in *Zahn* v. *Board of Public Works*, 195 Cal. 497, where it is said on page 512: "As to the objection that the ordinance was not retroactive but permitted the continuance of existing uses, it will suffice to say that for the purpose of zoning it is not necessary that existing uses shall be removed. . . . The ordinance was enacted with the purpose of directing the present and future development of the city and no attempt was made to remold its past development. To have required preliminarily to an enactment for future development, that all past development, not in conformity therewith, should be removed might be impractical. That the council did not attempt such a task has no tendency to show discrimination against property to be de-

veloped in the future." (See, also, *A. C. Blumenthal & Co., Inc.,* v. *Cryer,* 71 Cal. App. 668 [236 Pac. 216].)

It therefore appears that the instant case involves a situation materially different from that presented in the usual zoning case. The exercise of power in this instance is, on the whole, far more drastic than in those in which a mere right to engage in a particular business is restricted. We are asked to uphold a municipal ordinance which destroys valuable businesses, built up over a period of years. If we do so on the ground that this is a proper exercise of the police power in the enactment of zoning legislation, then it follows that the same thing may be done to apartment houses, flats, or stores. The establishment of many lawful and not dangerous businesses in a city would then become an extremely hazardous undertaking. At any time, in pursuance of a reasonable plan for its future development, the city could prohibit the continuance of the businesses, and make property valueless which was previously constructed and devoted to a useful purpose. It may well be that in the course of years one of the outlying permitted districts in the present scheme will become residential in character, and will, by another ordinance, be placed in the prohibited area. If the plaintiffs, at great expense, reestablish themselves in that district, they might be pursued and again eradicated. All this is to be justified under the police power as a proper taking of private property for public use, without compensation. The approval of such a doctrine would be a blow to rights in private property such as this court has never before witnessed. Only a paramount and compelling public necessity could sanction so extraordinary an interference with useful business.

What is the public necessity here? We have considered the ordinance solely as modern zoning legislation, for such is undoubtedly its character. There is, it is true, testimony in the record to show that the district was in some respects a less agreeable residential section than it would be if the businesses of plaintiffs were removed. Neighbors complained that the presence of the sanitariums depreciated the value of their own property. There is similar testimony as to occasional noises made by unruly patients, and of several patients having escaped; although in this connection the trial court found that "none of the inmates of any of said four sani-

tariums . . . has ever injured in any manner whatsoever any of the inhabitants of said Mar Vista District or elsewhere, nor has any of said inmates ever attacked or attempted to do bodily injury unto any of said inhabitants''.

From the evidence the court found that the conduct and operation of plaintiffs' businesses will tend to and does ''impair and endanger the health, safety, morals, convenience, comfort and welfare of the public, and will prevent the said district from obtaining its proper growth and from fully developing into the residential district to which it is devoted''. Another finding is that ''it is not true that said sanitarium . . . will not create, and is not a nuisance''. Assuming that the above statements are intended as a finding that the sanitariums of plaintiffs are nuisances as now conducted, it hardly seems supported by the record. For a discussion of similar evidence, see *Jardine* v. *Pasadena,* 199 Cal. 64, 75 [48 A. L. R. 509, 248 Pac. 225]. But even such a finding does not go to the root of the matter, and is, so far as the validity of this ordinance is concerned, wholly immaterial. The individual, or the city, still has the right to enjoin acts which constitute a private or public nuisance and this right is given as a protection against the improper conduct of any lawful business. (*Jardine* v. *Pasadena, supra; Adams* v. *Kalamazoo Ice & Fuel Co.,* 245 Mich. 261 [222 N. W. 86].) This ordinance expressly applies to any hospitals, asylums, and sanitariums for the care or treatment of persons suffering from ''mental or nervous diseases''. It affects all such places in the same manner, irrespective of whether they are conducted properly or improperly. The question of its constitutional validity must, therefore, be considered apart from the particular conditions alleged to exist in the establishments maintained by plaintiffs.

■ As so considered, we are satisfied that it cannot find support in the legislative power to prohibit nuisances. ■ A properly conducted sanitarium for the care and treatment of persons affected with ''mental or nervous diseases'' cannot, we feel, be held to constitute a nuisance. Mr. Justice Olney said in *San Diego Tuberculosis Assn.* v. *East San Diego,* 186 Cal. 252, 254 [17 A. L. R. 513, 200 Pac. 393]: ''That a well-conducted, modern hospital, even one for the treatment of contagious and infectious diseases, is not such a menace, but, on the contrary, one of the most

beneficent of institutions, needs no argument.'' This language was approved and a similar conclusion was reached in *Jardine* v. *Pasadena, supra.* In *Mayor and Council of Wilmington* v. *Turk*, 14 Del. Ch. 392 [129 Atl. 512], an ordinance which prohibited the maintenance of a private hospital in a residential district was held to be unreasonable in the particular case. These decisions are concerned with businesses closely analogous to those involved in the instant case. A case directly in point is *Ex parte Whitwell*, 98 Cal. 73 [35 Am. St. Rep. 152, 19 L. R. A. 727, 32 .Pac. 870], which fully supports our conclusion that a properly conducted institution for the treatment of nervous diseases is not a nuisance.

We repeat, therefore, that the ordinance involved herein is to be supported upon principles of zoning and not as a prohibition directed against actual nuisances. With this conclusion as a basis, it becomes necessary to determine whether that part of the ordinance which prohibits the further operation or maintenance of plaintiffs' businesses is a reasonable means by which the zoning power may be exercised. And here the distinction between the power to prohibit nuisances and the power to zone is exceedingly important. The power over nuisances is more circumscribed in its objects; but once an undoubted menace to public health, safety, or morals is shown, the method of protection may be drastic. Private businesses may be wholly prohibited, where their danger is sufficiently great; and other businesses, no matter how well established and how great the resulting loss, may be excluded from certain districts where, by reason of the circumstances, their maintenance has become a public nuisance in those districts. In these cases, the public welfare demands even the destruction of existing property interests. Examples of decisions of this type are *Ex parte Quong Wo*, 161 Cal. 220 [118 Pac. 714], involving a laundry, and *Hadacheck* v. *Sebastian*, 239 U. S. 394 [Ann. Cas. 1917B, 927, 60 L. Ed. 348, 36 Sup. Ct. Rep. 143], involving a brick-yard. While the latter case is an extreme illustration of the hardship which may result from an exercise of police power, it can be justified on the ground of nuisance regulation. It is not a zoning case at all. (See 39 Yale L. J. 735, 738, note 19.)

Zoning is not so limited in its purposes. It may take into consideration factors which bear no relation to the public health, safety or morals, but which come within the meaning of the broader term "general welfare". It deals with many uses of property which are in no way harmful. If its objects are so much broader than those of nuisance regulation; if its invasion of private property interests is more extensive; and if the public necessity to justify its exercise need not be so pressing, then does it not follow that its means of regulation must be more reasonable and less destructive of established interests? Must we say that the property of some of the residents of a district can be taken from them, without compensation, in order to make more attractive and pleasant the lives of other residents? "This background of nuisance law in the development of zoning occasionally leads to erroneous results. Property regulation by means of zoning is not restricted to what is disorderly or offensive . . . in attempting to apply to all types of zoning ordinances the summary methods of prevention and suppression which are employed in the case of nuisances, municipalities obviously fail to take into account the fact that zoning not only includes but also supplements nuisance regulation. A restriction imposed to prohibit an offensive use is not a taking of property for which compensation must be made and in the abatement of nuisances retroactive measures are valid. Granting that a zoning ordinance may operate retroactively where there is clearly an element of nuisance, it does not follow that a similar disposition may be made of every type of non-conforming use dealt with in zoning." (39 Yale L. J. 738.) "No one gainsays that a municipal government within its police powers has the right to prescribe rules regulating the character of buildings to be erected and the material to be used within certain prescribed boundaries . . . But such ordinances must . . . relate to the future. Of course, that does not prevent cities from moving to abate nuisances whenever occurring." (*Brown* v. *Grant*, (Tex. Civ. App.) 2 S. W. (2d) 285, 287.)

Seemingly in opposition to these widely held views is the conclusion reached by the Supreme Court of Louisiana, with respect to an ordinance of the city of New Orleans which prohibited the establishment or maintenance of any business within a specified district, and provided that all businesses then

in operation in the district should be liquidated in one year. In *State* v. *McDonald,* 168 La. 172 [121 South. 613], and in *State* v. *Jacoby,* 168 La. 752 [123 South. 314], the ordinance was held valid as applied to businesses in operation prior to its passage, which had failed to liquidate within the prescribed period. An examination of the language of the opinions indicates that the court did not consider the general question of the validity of retroactive zoning laws, but was concerned with the particular situation before it, and saw no material injury to the owner of the property. In the first case (*State* v. *McDonald, supra,* at p. 175) the court said: "In the instant case there is nothing . . . in the record on which the court would be authorized or justified in declaring the attacked provision of the ordinance harsh, arbitrary, or unreasonable . . . For all that appears, the business may be a small retail grocery business located in an outlying section far removed from the business center of the city. The defendants have not shown, and the court is unable to conjecture, any substantial reason why such a business could not be liquidated and closed out within a year." In the second case (*State* v. *Jacoby, supra,* at p. 317) the objection of the owner was disposed of in the same manner: "Defendants' drug store is a small one, and it is obvious that one year affords ample time within which to liquidate the business and close it."

These decisions are, we think, distinguishable from the instant case; but even if they were not distinguishable, we should not be disposed to follow them, for they exhibit, in our opinion, a confusion between the objects of zoning and nuisance regulation. (See 39 Yale L. J. 738.)

A more drastic decision, perhaps, is *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 [54 A. L. R. 1016, 71 L. Ed. 303, 47 Sup. Ct. Rep. 114], already mentioned in this opinion. There the ordinance created a residential district which included a large tract of land owned by the Ambler Realty Company, which had been held vacant for industrial purposes. The effect of the restrictive provisions of the ordinance was materially to impair the market value of the land. Although the lower federal court was of the opinion that this was an unreasonable interference with private property, the Supreme Court of the United States finally upheld it, three justices dissenting. This is an extreme case, and

has been recognized as such by zoning authorities. Thus, Baker, *supra*, says (p. 144) : "The ordinance involved in this case does not seem to be a reasonable application of the zoning principle, and the result is a distinct surprise." However harsh be the result of this decision, it is nevertheless in no sense decisive of the instant case, for it did not involve a retroactive ordinance. The Supreme Court recognized the difficulty that would be encountered in laying down a test of the validity of a restriction based solely upon the value of the property interest affected, yet in the subsequent case of *Nectow* v. *Cambridge,* 277 U. S. 183 [72 L. Ed. 842, 48 Sup. Ct. Rep. 447], it was held that a similar restriction involving a "serious and highly injurious" invasion of property was, under the particular circumstances, unreasonable. No general test can be derived from these or other cases, all of which reiterate the well-worn doctrine that each one must be decided on its particular facts. (See *Mayor of Wilmington* v. *Turk,* 14 Del. Ch. 392 [129 Atl. 512].) But we think that there is a decided difference between an ordinance which operates to limit the future use of property, no matter how great the impairment of its value, and one which requires the discontinuance of an existing use. In the first situation, we see merely the familiar example of an intangible and speculative future value being reduced as a result of the necessities of city planning; in the second we see the destruction of a going business. This latter action, if sanctioned by law, may have a serious and damaging effect on private enterprise generally, in addition to its manifest injury to the persons whose businesses are prohibited.

We do not mean to hold that those engaged in the zoning of cities must always be faced with the impossibility of eradicating the nonconforming uses. In some jurisdictions this problem has been dealt with by provisions against alteration or enlargement of existing structures, or rebuilding after their destruction. (See *State* v. *Hillman,* 110 Conn. 92 [147 Atl. 294] ; *Appeal of Ward,* 289 Pa. 458 [137 Atl. 630] ; *City of Earle* v. *Shackleford,* 177 Ark. 291 [6 S. W. (2d) 294].) But ordinarily the added benefit to the majority of the residents of the restricted district should not be received at the expense of others. If the city desires to abolish the nonconforming use, this may be a legitimate object

of the police power, but the means of its exercise must not include the destruction of the property interest without compensation. The words of Mr. Justice Holmes in *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 413 [28 A. L. R. 1321, 67 L. Ed. 322, 43 Sup. Ct. Rep. 158], are very much in point: "As applied to this case the statute is admitted to destroy previously existing rights in property and contract. The question is whether the police power can be stretched so far.

"Government could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most, if not all cases, there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature, but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power."

Further on, the learned justice remarks: "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. . . . In general, it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders. . . . We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

The principles set forth in the Pennsylvania Coal Company case were approved in *Piper* v. *Ekern*, 180 Wis. 586 [34 A. L. R. 32, 194 N. W. 159, 162], where a statute limiting the height of buildings surrounding the state capitol was held unconstitutional. The court said: " . . . in one sense such a restriction under the police power does not transfer property from the private owner to the public, as

is the case where the power of eminent domain is exercised; nevertheless, such restriction may be of such a nature as to practically accomplish the same result. . ... It has also been held that any regulation which deprives any person of the profitable use of his property constitutes a taking of property and entitles him under the Constitution to compensation, unless the invasion of rights is so slight as to permit the regulation to be justified under the police power. . . . " (See, also, *Isenbarth* v. *Bartnett,* 206 App. Div. 546 [201 N. Y. Supp. 383]:)

Even where the destruction of private property is warranted by vital public necessity, it is sometimes the legislative practice to compensate the injured owner. Such, for example, was the case with our legislation directed toward the eradication of bovine tuberculosis by the destruction of diseased cattle. (See *Patrick* v. *Riley,* 209 Cal. 350 [287 Pac. 455].)

Our conclusion is that where, as here, a retroactive ordinance causes substantial injury and the prohibited business is not a nuisance, the ordinance is to that extent an unreasonable and unjustifiable exercise of police power. Whether under our present law there exists the power to eliminate the nonconforming use by payment of compensation for the loss suffered, is a question not presented by this case, and one which we therefore do not attempt to determine.

It follows that the present ordinance is valid in so far as it prohibits the further establishment of businesses of this type in the restricted districts; and is invalid in its application to these plaintiffs.

The judgment is therefore reversed.

Richards, J., Seawell, J., Curtis, J., Preston, J., and Waste, C. J., concurred.

Rehearing denied.

Seawell, J., Shenk, J., and Curtis, J., dissented.