[L. A. No. 21977. In Bank. Mar. 27, 1953.]

BEVERLY OIL COMPANY (a Corporation), Appellant, v. CITY OF LOS ANGELES et al., Respondents.

George E. Cryer and R. Alston Jones for Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones, Assistant City Attorney, and Alan G. Campbell, Deputy City Attorney, for Respondents.

SHENK, J.—This is an appeal from a judgment for the defendants in an action seeking declaratory relief and to enjoin the defendants from enforcing a zoning ordinance alleged to restrict and eventually terminate the plaintiff's nonconforming use of land for oil production.

The plaintiff owns 11 1/6 acres of land bounded by San Vicente, Beverly and La Cienega Boulevards and West Third Street in Los Angeles. The first producing oil well on this property was drilled in 1908 and thereafter a total of ten or eleven oil wells were placed in production. In 1924 the property was annexed to the city as a part of the Fairfax Addition. In 1925 the city council passed its first zoning ordinance; it zoned a part of the area in question for limited industrial use (M-2) and the remainder for commercial use

(C-2). The use for drilling and production of oil was set apart for area "M-3" and was prohibited in "M-2" and "C-2" areas. However, the operation of existing wells in these areas was expressly permitted as a nonconforming use by the ordinance. In addition to the plaintiff's wells there were other wells in production in the area but as production declined these other wells were abandoned. By 1947 the only wells remaining in production were seven operated by the plaintiff on the property in question, and there are now no other wells for many miles. The wells yield approximately 6,000 barrels per month.

The area immediately surrounding the property is largely commercial with some light industrial development. All the surrounding streets are heavily traveled. On the westerly side the Pacific Electric Railway operates freight lines over its right of way. Beyond the immediately surrounding streets there is a dense residential development in every direction, although some of the area is zoned for light industrial and commercial development.

The present comprehensive zoning ordinance, effective June 1, 1946, is largely a reenactment of previous ordinances. It permits the continued nonconforming use of the land and the maintenance thereon of all nonconforming structures. However, it expressly provides that no new well for the production of hydrocarbon substances, which is a nonconforming use, shall be drilled nor shall existing wells be deepened. In 1945, prior to the reenactment of the present ordinance, the plaintiff instituted a suit against the city and obtained an adjudication that it could drill one new well in the center of its property, which it did. In addition the city in July, 1949, granted a variance which permits the plaintiff to drill on a triangular 2-acre plot within the 11 1/6-acre tract, as many as four new wells, provided that for each one of the wells so drilled it abandon an existing well in the overall tract.

By a 1949 amendment to the present ordinance it is provided that "The nonconforming use of land shall be discontinued within (5) five years from June 1, 1946 [the date of the enactment of the present ordinance], or within five (5) years from the date the use became nonconforming, in each of the following cases: (1) Where no buildings are employed in connection with such use; (2) Where the only buildings employed are accessory or incidental to such use. . . ," The plaintiff asserts that this amendment was

intended to terminate the nonconforming use of land for oil production, and that the situation precipitated by the amendment made it necessary to bring this action to protect its mineral rights. The case was argued in the trial court only on the question of the propriety of the enforcement of those provisions of the ordinance which prohibit drilling or re-drilling wells on the plaintiff's property. Although no specific reference was made to the 1949 amendment in the pleadings, still the validity of the ordinance as affected by the amendment seems to have been properly put in issue when it was alleged and denied that the defendants ''seek to prevent any additional drilling and to stifle and terminate the operation of the wells now on plaintiff's property. . . .'' Nevertheless it was incumbent upon the plaintiff to show that as between the parties a controversy existed with respect to the 1949 amendment before it could rely upon a threatened termination of its operations under the amendment as an invasion of its constitutional rights. The plaintiff failed to make such a showing. Furthermore, the provisions of the ordinance continue to permit the nonconforming use of buildings or structures (including derricks, pumping units, well casings, pipes, storage tanks) in section 12.23-B of the Los Angeles Municipal Code and the maintenance of such buildings or structures in section 12.23-A1.

The defendants assert that the administrative interpretation of the 1949 amendment in its application to the nonconforming use of land for the production of oil in a commercial or limited industrial zone, is that such use may be continued indefinitely since it necessarily involves the nonconforming use of nonconforming structures and therefore not within the purview of the amendment. At the trial no claim was made nor was any evidence presented to the effect that the defendants have taken any action or made any threat inconsistent with the asserted administrative interpretation. The trial judge specifically found that ''no evidence was introduced in this case that the defendants construe the provisions [of the 1949 amendment] as applicable to the subject property and that there is no evidence that defendants threaten to or will apply said provisions to the subject property; therefore, no findings of fact are made with respect to said matter.'' Any issue in regard to the 1949 amendment therefore becomes academic in this proceeding and the decision must rest upon the validity of actions taken or threatened by the defendants whereby a controversy is created.

Since this action was begun an amendment to section 12.23 of the Municipal Code provides that nonconforming oil wells must be abandoned after a 20-year period of liquidation. The effect of this latter provision was not in issue before the trial court and is not in issue here.

■ Comprehensive zoning has long been established as being a legitimate exercise of the police power. (*Miller* v. *Board of Public Works* (1925), 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479]; *Euclid* v. *Ambler Realty Co.* (1926), 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303].) The plaintiff has argued in the present case that the ordinance is invalid because it operates to take away or impairs his vested right to reach any and all oil underlying his property. ■ However, the very essence of the police power as differentiated from the power of eminent domain is that the deprivation of individual rights and property cannot prevent its operation, once it is shown that its exercise is proper and that the method of its exercise is reasonably within the meaning of due process of law. This was illustrated by the case of *Hadacheck* v. *Sebastian,* 239 U.S. 394 [36 S.Ct. 143, 60 L.Ed. 348], affirming *Ex parte . Hadacheck,* 165 Cal. 416 [132 P. 584, L.R.A. 1916B 1248], upholding a zoning ordinance of this same defendant, the city of Los Angeles, in a case similar in many respects to the present one. Hadacheck had erected his brickyard and kiln in an almost uninhabited locality several miles outside the city upon an 8-acre tract of land with soil peculiarly valuable for brickmaking. Subsequently the city boundaries were extended to include the locality and later a zoning ordinance was enacted which operated retroactively to require the removal of the industry. In its opinion the Supreme Court of the United States stated: ''It is to be remembered that we are dealing with one of the most essential powers of the government, one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily. A vested interest cannot be asserted against it because of conditions once obtaining. (*Chicago & Alton R. Co.* v. *Tranbarger,* 238 U.S. 67, 78 [35 S.Ct. 678, 59 L.Ed. 1204].) To so hold would preclude development and fix a city forever in its primitive conditions. There must be progress, and if in its march private interests are in the way they must yield to the good of the community.''

558

■ The policy in this state favors the conservation of oil deposits through statutory regulation (Oil and Gas Conservation, Pub. Resources Code, div. 3, ch. 1). The people have a "primary and supreme interest" in oil deposits (Pub. Resources Code, § 3400). And it is recognized that oil production is a business which must operate, if at all, where the resources are found. Nevertheless city zoning ordinances prohibiting the production of oil in designated areas have been held valid.

In *Pacific Palisades Assn.* v. *City of Huntington Beach*, 196 Cal. 211 [237 P. 538, 40 A.L.R. 782], the court stated that the city had "the unquestioned right to regulate the business of operating oil wells within its city limits, and to prohibit their operation within delineated areas and districts, if reason appears for so doing."

In *Marblehead Land Co.* v. *City of Los Angeles*, 47 F.2d 528 (cert. denied, 284 U.S. 634 [52 S.Ct. 18, 76 L.Ed 540]), the Circuit Court of Appeals affirmed a judgment of the district court denying an injunction against the enforcement of the Los Angeles zoning ordinance in its prohibition of oil well drilling operations in an area zoned for other uses. The argument raised the question of the right of the property owner to extract natural resources. The court stated (p. 532): ". . . there can be no question of the inherent right of the city to control or prohibit such production, provided it is done reasonably and not arbitrarily. In that event the loss must fall upon the owner whether it prevents him from erecting structures or establishing industries which he desires to erect or establish, or whether it prevents him from developing the inherent potentialities of his land." The court decided that the particular ordinance was not arbitrary or unreasonable, even though the city council had once amended the ordinance to permit oil drilling operations and had then repealed the amendment, while in the meanwhile the land had been leased for oil drilling purposes and a considerable sum of money had been spent in preliminary work.

■ It must be deemed to be well settled that the enactment of an ordinance which limits the owner's property interest in oil bearing lands located within the city is not of itself an unreasonable means of accomplishing a legitimate objective within the police power of the city.

There remains the question of whether the application of the ordinance in the circumstances of this case seeks to accomplish its legitimate objective in a manner which is reasonable and not arbitrary. It should be noted that the ordinance

does not prohibit the production of oil by the plaintiff, and the plaintiff's only objections to its enactment are that it cannot drill new wells, or redrill old wells to depths beyond the present level. It may redrill existing wells to their present level to improve their production. Furthermore, it requested and was granted a variance under which it may concentrate all of its oil production operations in a triangular 2-acre parcel, and may drill from within that area wells at such angles as to reach any presently producing deposit underlying the tract provided it abandons one of four existing wells for each new well drilled. In addition the plaintiff may drill an additional fifth well within the triangular area. When the effect of the variance is considered with the ordinance, it appears that the plaintiff is complaining of an impairment far less serious in effect than those previously considered and upheld. It has not been denied the right to extract the mineral wealth underlying its property, which denial has been upheld in other cases. In addition it appears that in some respects the plaintiff has been benefited by the operation of this ordinance. It is a known fact that oil is a migratory substance and that a well may drain the oil from underneath the adjoining properties (*Bernstein* v. *Bush*, 29 Cal.2d 773 [177 P.2d 913]). The plaintiff's wells may recover oil which could be recovered by surrounding owners if it were not for the prohibitions of the ordinance. The variance therefore places the plaintiff in a position which is highly favorable as against surrounding property so far as oil production rights are concerned.

 Since it must be shown that there has been an unreasonable, oppressive, or unwarranted interference with property rights in the exercise of the police power before a zoning ordinance can be held invalid (*Zahn* v. *Board of Public Works*, 195 Cal. 497, 514 [234 P. 388]; affirmed, 274 U.S. 325, 328 [47 S.Ct. 594, 71 L.Ed. 1074]; *Miller* v. *Board of Public Works*, 195 Cal. 477, 484, 488 [234 P. 381, 38 A.L.R. 1479]) we conclude that the plaintiff has failed to establish the invalidity of the present zoning ordinance, or as applied to the circumstances in this case that there has been an unconstitutional impairment of its property rights. The burden rests upon the plaintiff to establish the invalidity of the ordinance in its application to the property involved. The plaintiff's failure to sustain this burden raises a presumption of the existence of such facts as are sufficient to sustain the

ordinance. (*Pacific States Box & Basket Co.* v. *White*, 296 U.S. 176 [56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853].)

Other arguments advanced by the plaintiff are without merit. It attaches significance to the asserted fact that its operations did not constitute a nuisance. ██ However, the existence of a nuisance is not necessarily the basis upon which a zoning ordinance may operate against a particular industry. ██ The classification of zones and the granting of variances present questions generally within the discretion of the zoning authorities. Their determination may not be set at naught by the courts unless it is arbitrary and unreasonable. (*County of San Diego* v. *McClurken* (1951), 37 Cal.2d 683 [234 P.2d 972].) ██ It is to be noted that section 12.23 of the Los Angeles Municipal Code contains an express declaration that oil drilling and production in urbanized areas (which includes the zones within which this property lies) are detrimental to the public health, safety and welfare. Notwithstanding this the plaintiff has been allowed to produce oil in this urban area. The fact that its operations are restricted in a zone where others are permitted to operate planing mills, shooting galleries, skeet shooting, pigpens, wholesale poultry and rabbit slaughtering and stone cutting is not in itself a sufficient basis for holding that the zoning authorities have acted in an arbitrary or unreasonable manner in respect to the plaintiff's property, or that the declaration embodied in section 12.23 is improper.

The plaintiff relies upon *Jones* v. *City of Los Angeles* (1930), 211 Cal. 304 [295 P. 14], wherein the court refused to apply retroactively, so as to destroy the plaintiff's valuable sanatorium business, a zoning ordinance which forbade such institutions in residential areas. It was there held that it was unreasonable and arbitrary to destroy the plaintiff's sanatorium business under the circumstances of that case. Each case must be determined on its own facts. In the present case the record does not show that the plaintiff's business is threatened with destruction, but merely that it is regulated and restricted in a manner determined to be reasonable.

██ The plaintiff asserts that the action previously brought against the defendant (*Beverly Oil Co.* v. *City of Los Angeles*, L. A. Superior Court No. 500993) in 1945 is res judicata on the question of the invalidity of the ordinance. The judgment there was that the ordinance was void only insofar as it prohibited the plaintiff in the action from drilling one exploratory well, deeper than the old existing wells, in

the center of the property. The only relief sought in that action was an adjudication that the plaintiff had the right to drill this exploratory well, whereas in this action the plaintiff seeks an adjudication that the entire ordinance as applied to it is void.

■ The plaintiff argues that the defendant city is estopped to interfere with the recovery of oil under the plaintiff's land because the city has taxed the plaintiff's mineral rights. But the recognition of the existence of a property right and the requirement that it be subject to taxation does not mean that the right may not be legally regulated. An authorized restriction on the use of such a right cannot invalidate the ordinance.

No other points require discussion.

The judgment is affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I dissent.

It is a matter of history that the device of zoning by ordinance was conceived as providing a method whereby discriminatory measures otherwise unlawful could be sustained. As related by W. L. Pollard of the Los Angeles Bar (Annals of the American Academy of Political and Social Science (May, 1931), vol. 155, part II, Zoning in the United States, pp. 17-18), "The so-called 'laundry cases' in San Francisco and elsewhere in northern California were the first California cases wherein the right of the City Council or the Board of Supervisors to restrict and prohibit certain uses within given districts in a city was recognized. . . . From 1870 to 1890, much of the laundry work in San Francisco was done by Chinese. This period marks the time of the violent anti-Chinese disturbances in California. Many state laws and city ordinances were enacted which sought to discriminate against the Chinese. All of these laws and ordinances were invalidated by the courts.

"At one time there were over three hundred Chinese laundries scattered through the residence and business districts of San Francisco. Practically all the structures of San Francisco were frame, and the presence of these laundries presented a definite fire hazard, as they had much combustible material—cloth and wood, and so forth—piled on the floors in buildings where fire was extensively used for boiling water,

heating irons, and other purposes. Likewise, these laundries used large quantities of water which, having been used for washing purposes, became impregnated with soap and the substances washed from the clothes, and when turned into the gutters or other drainage facilities then present in the city, was objectionable from the standpoint of odor. The laundries were also unsightly, in that the buildings were usually frame structures with drying lines on the roofs or inside the yards.

"The City Council of San Francisco seized upon these facts as a basis for their regulatory ordinances. The fact that the laundry buildings were becoming the clubs of the Chinese added to their objectionable features in the popular mind, and stirred the legislative body to drastic action. . . . The ordinances carried penal clauses and were enacted under police power . . ." They declared that "the indiscriminate establishment of public laundries . . . is injurious and dangerous to public health . . . and prejudicial to the well-being and comfort of the community, and depreciates the value of property . . ." Such ordinances "did not entirely prohibit laundries in certain districts but required them to procure permits from the Fire Wardens, the Board of Public Health, or the Board of Supervisors . . ."

The Annals of the American Academy continues: "While the ordinances did not specifically mention Chinese laundries, they were so drafted that in effect they were directly aimed at the existence and the operation of such establishments conducted by the Chinese. On December 28, 1885, a Chinese named Yick Wo was arrested . . . and charged with violating one of these ordinances."

Yick Wo, it seems, was well possessed of some of those admirable attributes of the Chinese people which have given so many of them (as has been apparent to the world in later generations, before, during, and since World War II) the will, the courage and the perseverance to fight on against powerful aggressors who would enslave them. Mr. Yick was convicted. He carried his fight through several courts, including this court, which in denying him relief (*In the Matter of Yick Wo* (1885), 68 Cal. 294, 299, 305 [9 P. 139, 58 Am.St. Rep. 12]) admitted that "Clothes-washing is certainly not opposed to good morals, or subversive of public order or decency," but held that "it may be highly dangerous to the *public* safety," that "The process of washing is not prohibited by . . . regulating the places at which, and the surroundings by which, it must be exercised," and that "We have not

deemed it necessary to discuss the question in the light of supposed infringement of petitioner's rights under the constitution of the United States . . ." Yick Wo, however, was not licked. He carried his fight to the Supreme Court of the United States and in the now historic decision (*Yick Wo* v. *Hopkins* (1886), 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220]) he was freed.

I think it regrettable that this court, from its Yick Wo decision down to date, has shown so little inclination to protect private citizens against discriminatory, unfair, and, as concerns all legitimate objectives of valid zoning regulations, unnecessarily harsh, measures. The whole concept and the course of application of zoning laws, from their genesis in Yick Wo for the very purpose of accomplishing unlawful discrimination by "legal" means, have been characterized by a lack of reciprocating fairness. As stated in the Annals of the American Academy (p. 21) above referred to, "the courts have not as yet fully [and I would interpolate, fairly] recognized the zoning idea by holding that, once a city has zoned its area and set aside some portions thereof for industrial use, thereafter any industry permitted therein shall have full right to operate unhampered by nuisance charges, so long as it uses up-to-date machinery and conducts its business under rules of standard practice." In other words, the zoning concept and its application, to be more nearly fair, should include protection for property rights rather than being used exclusively, or predominantly and controllingly, for taking such rights without compensation.

The framers of our form of government did not contemplate that private property should be taken for public use without compensation. (U.S. Const., Fifth Amendment; Cal.Const., art. I, § 14; *Chicago, Burlington & Q. R. Co.* v. *Chicago* (1897), 166 U.S. 226, 236, 241 [17 S.Ct. 581, 41 L.Ed. 979].) Zoning does take it for a public use—often a purely esthetic and very nebulous one—and the way our court has interpreted and applied the law, no compensation has been allowed. Upon my view of the record here the plaintiff is being quite unnecessarily, arbitrarily, and to no substantially good end, deprived without compensation of valuable property rights.

Under the ordinance here involved, although plaintiff may continue to produce oil and may redrill, it is precluded from drilling to depths beyond the present level. It is a matter of common knowledge among those who have had any substantial contact with the oil producing industry that in Cali-

fornia some of its richest production has been achieved by tapping the deeper sands after shallower production had been largely exhausted. It seems difficult to conceive of a more useless, unnecessary and wholly arbitrary "regulation" than that involved herein, which while permitting the drilling for, and the production of, oil on plaintiff's property limits the drilling and production to preexisting depths.

I would reverse the judgment.