[S. F. No. 19149.  In Bank.  Oct. 27, 1955.]

THE ROMAN CATHOLIC WELFARE CORPORATION
OF SAN FRANCISCO (a Corporation), Petitioner, v.
CITY OF PIEDMONT et al., Respondents.

Andrew F. Burke for Petitioner.

Irving Shore, Marvel Shore, Lawrence Speiser, Philip Adams, Wayne M. Collins, William Coblentz, Kamina K. Gupta, Ruth Church Gupta, George G. Olshausen, Albert C. Agnew, Ira W. Barr, Leo Pfeffer and Philip Baum as Amici Curiae on behalf of Petitioner.

J. Marcus Hardin, City Attorney, and Cyril Viadro for Respondents.

J. W. O'Neill as Amicus Curiae on behalf of Respondents.

CARTER, J.—This is a proceeding in mandamus by petitioner, the Roman Catholic Welfare Corporation of San Francisco, to compel the issuance of a building permit for the construction of a building to be used for an elementary school in which secular and religious subjects were to be taught. The building permit was denied on the sole ground that a zoning ordinance of the city of Piedmont prohibited the construction of any school within Zone A, where petitioner's land is located, except public schools under the jurisdiction of the board of education of the city of Piedmont. In Zone A, there are three elementary schools, one junior high school and one high school, all under the jurisdiction of the board of education of the city. The ordinance in question was passed by the city council and approved by a large majority of the voters at a general election.

There is only one question involved: Whether the city of Piedmont may, by ordinance, constitutionally prevent the construction of a building to be used for private school purposes in an area where public schools are located.

█ "It is well settled that zoning ordinances, when reasonable in object and not arbitrary in operation, constitute a justifiable exercise of police power, . . . █ Every intendment is in favor of the validity of the exercise of police power, and, even though a court might differ from the determination of the legislative body, if there is a reasonable basis for the belief that the establishment of a strictly residential district has substantial relation to the public health, safety, morals or general welfare, the zoning measure will be deemed to be within the purview of the police power." (*Wilkins* v. *City of San Bernardino*, 29 Cal.2d 332, 337 [171 P.2d 542].)

We must then determine whether, in the instant case, there

is a reasonable basis for the ordinance prohibiting private schools in an area where public schools are permitted. Petitioner acquired its property subsequent to the time the ordinance was passed. It is conceded that the question is one of first impression in this state.

The record shows that Zone A is composed of 98.7 per cent of the entire area of the city of Piedmont and is populated by approximately 98.2 per cent of the entire population of the city of Piedmont. Zone B has .59 per cent of the area of the city and consists of three noncontiguous parcels of land none of which is unimproved; Zone C has .24 per cent of the area of the city and consists of 10 noncontiguous parcels of land none of which is unimproved; Zone D has .46 per cent of the total area of the city and consists of five noncontiguous parcels of land two of which are unimproved. Private schools are permitted in Zones B, C, and D. The land owned by petitioner and on which it is contemplated the private school in question will be constructed is immediately adjacent to Corpus Christi (Roman Catholic) Church.

Petitioner argues that the ordinance in question is unconstitutional and void because of its arbitrary and unreasonable discrimination against private schools. Respondents, on the other hand, argue that the ordinance constitutes a reasonable exercise of the city's police power in that the city is primarily residential in character, that in excluding private schools, the city council could consider such factors as the character of the district, the conservation of property values, public opinion, matters affecting traffic control, size of streets, parking, noise, fire protection, overburdening of water mains and sewers, and the peace, comfort and quiet of the district. It is contended that private schools may be located in the three remaining zones; that the proposed school would be attended by children from both Oakland (the adjacent city) and Piedmont and perhaps children from other communities while the public schools in the zone would be attended by only Piedmont children and that the larger number of children would bring about more noise and traffic hazards with the necessity for more traffic control. Respondents rely on *State v. Sinar*, 267 Wis. 91 [65 N.W.2d 43, 47], a mandamus action by a private, nonprofit corporation to compel the city building inspector to issue a permit for the construction of a private high school in a class "A" residential zone where public schools were permitted. It was there held, with two justices dissenting, that ". . . tangible differences material to the

classifications of the ordinance can be readily pointed out which sustain the distinction made by the ordinance between the schools. To begin with, the term 'public' is the antithesis of 'private.' The public school is not a private one. They serve different interests and are designed to do so. The private school is founded and maintained because it *is* different. Is that difference material to the purpose of zoning? In many respects the two schools perform like functions and in probably all respects concerning noise, traffic difficulties and the other objectionable features already mentioned they stand on an equality, so that in several of the objects of zoning ordinances,—the promotion of health, safety and morals, as laid down by section 62.23(7) (a), Statutes, and developed by respondent's brief. we may not say that the two schools differ. But when we come to 'the promotion of the general welfare of the community,—'Aye, there's the rub.' The public school has the same features objectionable to the surrounding area as a private one; but it has, also, a virtue which the other lacks, namely, that it is located to serve and does serve that area without discrimination. Whether the private school is sectarian or commercial, though it now complains of discrimination, in its services it discriminates and the public school does not. Anyone in the district of fit age and educational qualifications may attend the public high school. It is his right. He has no comparable right to attend a private school. To go there he must meet additional standards over which the public neither has nor should have control. The private school imposes on the community all the disadvantages of the public school but does not compensate the community in the same manner or to the same extent. If the private school does not make the same contribution to public welfare this difference may be taken into consideration by the legislative body in framing its ordinance. If education offered by a school to the residents of an area without discrimination is considered by the council to compensate for the admitted drawbacks to its presence there, that school may be permitted a location which is denied to another school which does not match the offer, and we cannot say that such a distinction is arbitrary or unreasonable or that such discrimination between the two schools lacks foundation in a difference which bears a 'fair, substantial, reasonable and just relation' to the promotion of the general welfare of the community, which is the statutory purpose of zoning laws in general and of the ordinance in question.'' The dissenting opinion pointed

out that the primary purpose of all schools was to educate the students; that the state was interested in having educated children to the end that they eventually become good citizens; that private schools as well as public ones promote the general welfare and that there was no substantial difference in the purpose which they served. The dissenting opinion quoted from the case of *Catholic Bishop of Chicago* v. *Kingery,* 371 Ill. 257 [20 N.E.2d 583, 584], where it was said: "We fail to perceive to what degree a catholic school of this type will be more detrimental or dangerous to the public health than a public school. It is not pointed out to us just how the pupils in attendance at the parochial school are any more likely to jeopardize the public safety than the public school pupils. Nor can we arbitrarily conclude that the prospective students of the new school will seriously undermine the general welfare. As a matter of fact such a school, conducted in accordance with the educational requirements established by State educational authorities, is promotive of the general welfare."

Petitioner argues that parents have the basic constitutional right to have their children educated in schools of their own choice, subject to reasonable regulations as to subjects required to be taught, manner of instruction, etc. In *Pierce* v. *Society of Sisters,* 268 U.S. 510, 534 [45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468], it was held that the Act of 1922 which required every parent, guardian, etc. of a child between 8 and 16 years to send him "to a public school for the period of time a public school shall be held during the current year" ". . . unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Respondents seek to distinguish the Pierce case on the ground that it involved an established business conducted for a substantial profit which would be destroyed had the act in question been enforced;

and on the ground that the Oregon statute sought to keep private schools out of the entire State of Oregon. It is argued that here in the event the ordinance is enforced, Piedmont parents will continue to send their children to those private schools which are in existence outside the city limits of Piedmont. Respondents' argument is based on the theory that in the Pierce case it was considered unreasonable to expect Oregon parents to send their children out of the state to attend private schools while it is not unreasonable to expect Piedmont parents to send their children to private schools outside the city limits. This begs the question. Parents have the right to send their children to private schools, rather than public ones, which are located in their immediate locality or general neighborhood. It is also argued by the city that even the constitutional right of parents to educate their children as they choose (*Pierce* v. *Society of Sisters, supra,* 268 U.S. 510) must yield to a reasonable exercise of the police power. This argument adds nothing to the ones heretofore made. The question of the reasonableness of the ordinance is the primary one involved here.

In Yokley, Zoning Law and Practice (2d ed.), volume 1, section 57, at page 89, it is said: "In the light of a well known Illinois decision [*Catholic Bishop of Chicago* v. *Kingery,* 371 Ill. 257 (20 N.E.2d 583)] affecting discrimination between classes of schools permitted in certain zones, it is well to again state the general principle that a zoning ordinance restricting the property rights of an individual without having any direct or substantial relationship to the promotion of the public health, safety, morals or welfare, is invalid. In this case a village zoning ordinance expressly permitting the maintenance of public schools but impliedly prohibiting private or parochial schools in a residential section was declared to be invalid as having no substantial relationship to the promotion of the public health, safety, morals or welfare, the court holding that the restriction amounted to a capricious invasion of property rights.

"There are many other cases which have been reported that uniformly follow this rule that discrimination between public and private schools will not be tolerated. . . ."

In *Mooney* v. *Village of Orchard Lake,* 333 Mich. 389 [53 N.W.2d 308, 310], a suit was brought by the Roman Catholic Archbishop to enjoin defendants from enforcing a zoning ordinance which prohibited churches and schools in a certain residential area. The court held it would not indulge in a

presumption that the ". . . exclusion of school and church from an entire municipality is conducive to public health, safety, morals or the general welfare, . . . A thesis so inconsistent with the spirit and genius of our free institutions and system of government and the traditions of the American people will not be accepted by way of presumption, nor at all in the absence of competent evidence establishing a real and substantial relationship between the attempted exclusion and public health, safety, morals or the general welfare and, hence, the reasonableness and validity of the restriction upon use of private property as a legitimate exercise of the state's police powers." In the Mooney case, the facts show that there, as here. the zoning ordinance had the practical effect of excluding private schools from the entire community.

In *State* v. *Northwestern Preparatory School*, 228 Minn. 363 [37 N.W.2d 370, 371], it was held that a city zoning ordinance permitting public schools in a residential area while prohibiting private schools violated the equal protection clauses of the federal Constitution and the Minnesota Constitution. It was noted that a private school has "no effect upon a residential area different from that of a public or parochial one." In *Lumpkin* v. *Township Committee of Bernards Tp.*, 134 N.J.L. 428 [48 A.2d 798], it was held that a township zoning ordinance permitting premises in a residential A zone to be used as a school by a church, but prohibiting use of such premises for a private boarding school for boys, was invalid because it bore no substantial relation to the public health, morals, safety, or general welfare. It was also held that such an ordinance denied the fundamental rights guaranteed by the Fourteenth Amendment to the federal Constitution. In *Concordia Collegiate Institute* v. *Miller*, 301 N.Y. 189 [93 N.E.2d 632], it was held that an amendment to a zoning ordinance which permitted a school in a residential district after the petitioner had filed the consents of 80 per cent of the owners of property in the district was invalid as violative of the due process clauses of the federal and state Constitutions. Quoting from *Nectow* v. *City of Cambridge*, 277 U.S. 183 [48 S.Ct. 447, 72 L.Ed. 842], it was held that "The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare." In *State* v. *Joseph,* 139

Ohio St. 229 [39 N.E.2d 515], it was held that a zoning ordinance excluding churches from a residential district was not justified for the protection of public health and safety by preventing increased noise, confusion, traffic congestion and parking difficulties, or because of the adverse effect on values of adjacent lands, or for the protection of the public morals and welfare. It was held not a proper governmental function to exclude churches from a residential district of a municipality in the name of the public for the purpose of securing benefits of exclusive residential restrictions to adjacent landowners. In *State ex rel. Roman Catholic Bishop of Reno* v. *Hill,* 59 Nev. 231 [90 P.2d 217], it was held that a zoning ordinance requiring the written permission of 75 per cent of the property owners before a church could be erected in a residential district was void as violative of the due process clauses of the state and federal Constitutions.

Respondents contend that the cases from other jurisdictions are distinguishable from the one under consideration, and that in many of the sister states the Supreme Courts are as ''anti-zoning as the record of this Court is pro-zoning.'' While on the facts, many of the cases may be distinguishable, the reasoning which leads to the conclusion that an ordinance is invalid which excludes private schools from an area in which public schools are found is persuasive. It is difficult to make an argument that private schools are inimical to the public welfare while public schools are not.

Respondents argue that Piedmont can neither ''allow nor refuse to allow'' public schools in Zone A in that only the board of education, an agency of the state, has that power. It is conceded that the wording of the ordinance purports to permit public schools in the area but that the reality of the situation is that Piedmont would have no power to exclude such schools. The question is not here involved whether the city could enact reasonable legislation concerning public schools. In *Butterworth* v. *Boyd,* 12 Cal.2d 140, 152 [82 P.2d 434, 126 A.L.R. 838], it was held that ''The school system has been held to be a matter of general concern, rather than a municipal affair, and consequently is not committed to the exclusive control of local governments. But the cities may make local regulations beneficial to and in furtherance of the school system, provided that these provisions do not conflict with the general law. (*Whitmore* v. *Brown,* 207 Cal. 473 [279 P. 447]; *Esberg* v. *Badaracco,* 202 Cal. 110 [259 P. 730]; *Anderson* v. *Board of Education,* 126 Cal.App.

514 [15 P.2d 744, 16 P.2d 272].)'' A comprehensive zoning ordinance of the city of Los Angeles was held proper where it involved to some extent a part of the public school system (*Ransom* v. *Los Angeles City High Sch. Dist.*, 129 Cal.App. 2d 500 [277 P.2d 455]). Whether a city could zone to exclude public schools is not before us now, nor has it been before a court of this state so far as can be ascertained. The only question before us is whether a city may, constitutionally, by legislation exclude all private schools from 98.7 per cent of its total area—which, when the character of the remaining area is taken into consideration, constitutes an effective exclusion of private schools from the entire city.

Respondents argue that a private school will be free from any control as distinguished from the control exercised over public schools. This argument is without merit. The Education Code provides in part (§ 16624) that ''Such school [private] shall be taught in the English language and shall offer instruction in the several branches of study required to be taught in the public schools of the State. The attendance of the pupils shall be kept by private school authorities in a register, and the record of attendance shall indicate clearly every absence of the pupil from school for a half day or more during each day that school is maintained during the year'' Insofar as other regulations in the interest of the public welfare are concerned, no doubt the city, acting under its police power, could insure the preservation of the public peace and the preservation of private property.

It is also argued by respondents that the owner of a private school may, if the ordinance is struck down, locate the school as dictated by its own welfare and interests without any control on the part of the city. This question is not before us. Each case must be decided on its facts, and before us we have only the question of a private school to be located adjacent to a Catholic church in the area where public schools are found. Respondents' argument that a private school located in the precise location involved here would be inimical to the public welfare is not convincing Respondents point to no exceptional circumstances concerning the particular location of this particular school. The state's basic zoning statute provides that a city ''may by ordinance regulate, restrict and segregate the location of . . . the several classes of public and semi-public buildings, and the location of buildings or property designed for specified uses. . . .'' (Deering's Gen. Laws, 1943, Act 994, § 2) Article XI, sec-

tion 11, California Constitution, also provides that "Any county, city, town or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws."

Respondents place reliance upon the case of *Corporation of Presiding Bishop* v. *City of Porterville,* 90 Cal.App.2d 656 [203 P.2d 823], in which it was held that by ordinance the city could prohibit all churches in a residential area. That case is distinguishable from the one under consideration. Here, only private schools are excluded—not *all* schools as were all churches in the Porterville case. ▮ It is well settled that "no law within the broad areas of state interest may be unreasonably discriminatory or arbitrary. The state's interest in public education, for example, does not empower the Legislature to compel school children to receive instruction from public teachers only, for it would thereby take away the right of parents to direct the upbringing and education of children under their control." (*Pierce* v. *Society of Sisters, supra,* 268 U.S. 510, 534, 535.)

Careful examination of the arguments in support of the legislation in question reveals that there is absent the compelling justification which would be needed to sustain discrimination of the nature here involved.

For the reasons above stated it would appear that the ordinance here involved is unconstitutional and void because of its arbitrary and unreasonable discrimination against private schools.

Let the peremptory writ of mandate issue as prayed.

Gibson, C. J., Shenk, J., and Traynor, J., concurred.

SCHAUER, J., Dissenting.—Regardless of how beneficial and desirable we personally may think this particular school would be, it is our duty to uniformly apply the law and not, in order to obtain a result here, set a precedent which will have the effect of generally opening residential areas in all cities to private schools. It is particularly important that we carefully consider and apply the law here because this case appears to be designed as a test case to set the pattern for other communities. The attack is directly upon the classification as between public schools and private schools, and the impact of the ordinance upon petitioner's "business and property." The petition for the writ is completely silent upon whether the ordinance does or does not provide for

variances or nonconforming uses or exceptions, or for administrative procedures in respect thereto, or whether any effort has been made to secure an amendment or exception or other relief.[1]

The only real issues in this case are two: (1) The ordinance classifies schools, for purposes of zoning, as those which are "under the jurisdiction of the Board of Education of the City of Piedmont," and those which are not so governed. Is this classification unconstitutional?

· (2) The petitioner attacks the application of the ordinance to its "business and property," with the charge that "Unless respondents are compelled . . . to issue to petitioner the permit which it has requested, and thus authorize the petitioner to construct, erect and establish its proposed school, petitioner's business and property will suffer irreparable injury." Does petitioner sustain this attack?

### Classification.

Classifying as between public and private ownership or management of a service or business is not new. It is elementary that the conduct of a public school is a public service while the operation of a private school is a private business. The Constitution of California provides in article IX for public schools (see also art. XIII, § 15), and in section 15 of article XVI declares among other things that the public school system is "a matter of general concern inasmuch as the education of the children of the State is an obligation and function of the State."

General principles applicable to the classification inherent in zoning ordinances are that: "[A] zoning ordinance enacted pursuant to a comprehensive plan of community development, 'when reasonable in object and not arbitrary in operation,' will be sustained as a proper exercise of the police power; every intendment is in favor of its validity, and a court will not, 'except in a clear case of oppressive and arbitrary limitation,' interfere with the legislative discretion:

---

[1]The general rule is that "A party aggrieved by the application of a statute or ordinance must invoke and exhaust the administrative remedies provided thereby before he may resort to the courts for relief. [Citations.]" (*Metcalf* v. *County of Los Angeles* (1944), 24 Cal.2d 267, 269 [148 P.2d 645]; see also *Essick* v. *City of Los Angeles* (1950), 34 Cal.2d 614, 622-623 [213 P.2d 492]; *Lockard* v. *City of Los Angeles* (1949), 33 Cal.2d 453, 457 [202 P.2d 38, 7 A.L.R.2d 990]; *Bernstein* v. *Smutz* (1947), 83 Cal.App.2d 108, 114-115 [188 P.2d 48]; *City of San Mateo* v. *Hardy* (1944), 64 Cal.App.2d 794, 797 [149 P.2d 307].)

it is presumed to be adapted to promotion of the public health, safety, morals and general welfare; and though the court may differ with the zoning authorities as to the 'necessity or propriety' of the regulation, so long as it remains a 'question upon which reasonable minds might differ,' there will be no judicial interference with the municipality's determination of policy.'' (*McCarthy* v. *City of Manhattan Beach* (1953), 41 Cal.2d 879, 885-886 [264 P.2d 932]; *Clemons* v. *City of Los Angeles* (1950), 36 Cal.2d 95, 98-99 [222 P.2d 439]; see also ''zoning,'' 12 Cal.Jur. 10-Yr.Supp. pp. 166-168, § 25,. and cases there cited.) '' [T]he establishment, as part of a comprehensive and systematic [zoning] plan, of districts devoted to strictly private residences or single family dwellings, from which are excluded business or multiple dwelling structures, is a legitimate exercise of the police power. [Citations.]'' (*Wilkins* v *City of San Bernardino* (1946), 29 Cal.2d 332, 337-338 [171 P.2d 542]; see also *Miller* v. *Board of Public Works* (1925), 195 Cal. 477, 490-491 [234 P. 371]; *Corporation of Presiding Bishop* v. *City of Porterville* (1949), 90 Cal.App.2d 656, 659 [203 P.2d 823].)

It appears clear that the classification—as between private and public schools—attacked by petitioner in the ordinance here involved has not been shown to be such that reasonable minds may not differ concerning it. The city of Piedmont, a small city with a total area of approximately 1152 acres and a population of less than 12,000, is an ''island'' entirely surrounded by the city of Oakland. In 1929 a comprehensive zoning ordinance was adopted, dividing the city into four zones designated as Zones A, B, C. and D, respectively. As amended in 1936, but prior to the time petitioner acquired its property here involved, section 3 of the ordinance provides that ''No building . . . shall be erected . . . in Zone 'A', which is . . . intended to be occupied or used for any purpose other than a single family dwelling, church, or public school under the jurisdiction of the Board of Education of the City of Piedmont . . .'' The zoning provision which thus bans private schools from the single family residential Zone A, was approved by a vote (3,408 to 1,285) of the electors of the city. Zone A embraces approximately 1137.14 acres, including the land here involved upon which petitioner desires to construct and operate a private school. Such schools are permitted in the other three zones.

As establishing petitioner's failure to show invalidity of the ordinance, it may be pointed out in the first place that

although the majority opinion declares that the only question involved in this controversy is ''Whether the city of Piedmont may, by [a comprehensive zoning] ordinance, constitutionally prevent the construction of a building to be used for private school purposes in an area [a single family residential zone] where public schools are located,'' it appears to be conceded by petitioner for the writ that the city does not have power or the legal right to exclude *public* schools, which are under the jurisdiction of the board of education, from its single family residential Zone A, which is here involved. (See Cal. Const., art. IX; see also *Butterworth* v. *Boyd* (1938), 12 Cal.2d 140, 152 [82 P.2d 434, 126 A.L.R. 838]; *Gerth* v. *Dominguez* (1934), 1 Cal.2d 239, 242 [34 P.2d 135]; *Ward* v. *San Diego Sch. Dist.* (1928), 203 Cal. 712, 715-717 [265 P. 821]; *Esberg* v. *Badaracco* (1927), 202 Cal. 110, 115-119 [259 P. 730].) A public school district has the power of eminent domain and may be allowed, by condemnation, in a proper case, to acquire property for a school site. (See e.g., *Long Beach City H. S. Dist.* v. *Stewart* (1947), 30 Cal.2d 763 [185 P.2d 585, 173 A.L.R. 249]; *State ex rel. Britton* v. *Mulloy* (1933), 332 Mo. 1107 [61 S.W.2d 741].) It follows that, as contended by the city, if it is without power to exclude public schools from Zone A, then its zoning ordinance which excludes private but not public schools from that zone cannot fairly be held to invalidly discriminate against private and in favor of public schools. The general classification as between public schools and private schools is set up by the Constitution itself.[2] Thus it seems indisputable that the classification here involved is not, as such, vulnerable to petitioner's attack.

---

[2]See Constitution of California, article IX: "Sec. 5. The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established.

"Sec. 6. . . . The Public School System shall include all kindergarten schools, elementary schools, secondary schools, technical schools, and state colleges, established in accordance with law and, in addition, the school districts and the other agencies authorized to maintain them. No school or college or any other part of the Public School System shall be, directly or indirectly, transferred from the Public School System or placed under the jurisdiction of any authority other than one included within the Public School System. . . .

"Sec. 8. No public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the exclusive control of the officers of the public schools; nor shall any sectarian or denominational doctrine be taught, or instruction thereon be permitted, directly or indirectly, in any of the common schools of this State."

Turning now to the application of the ordinance under the circumstances of the case and as affecting petitioner's "business and property," the following defects in its case appear: It has not been established as a fact that there are no adequate areas in which private schools may be built which would be reasonably accessible to residents (either children or adults) of the city of Piedmont. As already stated, Piedmont, a small city, is entirely surrounded by the city of Oakland, and, further, petitioner's property is actually bounded on one side by a boulevard which is entirely within Oakland. Thus, not only has it been here shown that there are approximately 15 acres of land within Piedmont which are outside residential Zone A and upon which private schools are permitted under the zoning ordinance, but it has *not* been shown that there is no available and reasonably accessible land within the surrounding city of Oakland upon which private schools are permitted. It seems obvious, therefore, that petitioner has failed to establish either that it is being oppressively and arbitrarily prevented from operating a private school catering to residents of Piedmont, or that Piedmont residents are being prevented from attending private schools; those wishing to attend, or to send their children to, private schools may, so far as appears, utilize such schools in Oakland or elsewhere in the San Francisco Bay area as it may be presumed they have done in the past. Furthermore, there is a complete absence of showing of an attempt by the city of Piedmont or by any other governmental unit to compel attendance at public schools only, or to take away the right of any parents to direct the upbringing or education of children under their control. Whether or not any particular property owner is or is not permitted to carry out his desires for future development of his particular property into a private school obviously has no bearing upon the rights of either adults or children to attend private schools. (See *Corporation of Presiding Bishop* v. *City of Porterville* (1949), *supra*, 90 Cal.App.2d 656, 660.)

In the next place, Piedmont, under the terms of its freeholders' charter, is "primarily a residential city," and has been recognized as such by this court. (*Reynolds* v. *Barrett* (1938), 12 Cal.2d 244, 246, 249 [83 P.2d 29].) It is stipulated that petitioner's projected school would *not* be under the jurisdiction of the Board of Education of the city of Piedmont, but would be "owned and operated by petitioner" and would be constructed and operated next door to land on

which "are a Roman Catholic Church, and a rectory occupied by priests of said Church who serve Corpus Christi Parish in the Archdiocese of San Francisco of such Church." Thus it is indicated the proposed private school would draw pupils not only from Piedmont but from surrounding San Francisco Bay area communities, whereas, presumptively, only Piedmont children attend public schools located in that city. If the city is compelled to permit petitioner's contemplated private school, then it would seem that it will be equally compelled to permit other private schools in its single family residential zone. That is, it must permit all private schools to enter equally unless this court is prepared to examine and censor or itself prescribe the projected curriculum, or other basis of classification, of each private school which proposes to construct a building and playground and commence business in Piedmont's Zone A. It is elementary that "The power of the legislature to impose restrictions on a lawful calling must be exercised in conformity with the constitutional requirement that such restrictions must operate equally upon all persons pursuing the same business or profession under the same circumstances. . . . Hence, if a statute allows one class of persons to engage in what is presumptively a legitimate business while denying such right to others, it must be based upon some principle which may reasonably promote the public health, safety, or welfare." (11 Am.Jur. 1046-1047, § 285.) This court cannot in good conscience create a classification which it could not sustain if created by the Legislature.

A list provided by property owners opposing petitioner in this proceeding, of the various private schools taken from the classified section of the San Francisco Bay area telephone directories shows at least 176 private schools, including among others, schools affiliated with various religious groups,[3] driving

[3]Among the names listed are: Baptist Divinity School, Holy Names School, Our Lady of Perpetual Help School, Mt. St. Joseph's School, Redeemer Lutheran School, Seventh Day Adventist School, West Portal Lutheran School, Zion Lutheran Church and School, St. Anne's School, St. Anthony's School, St. Augustine's School, St. Boniface School, St. Brigid School, St. Charles School, St. Dominic's School, St. Elizabeth's School, St. Emydius School, St. Gabriel School, St. Ignatius High School, St. James Boys School, St. John Lutheran School, St. Mary's Chinese Day School, St. Mary's Chinese Language School, St. Paul's Grammar School, St. Paul's High School, St. Philip's School, St. Stephens School, St. Vincent de Paul School, St. Vincent's High School, St. Columba School, St. John's School, St. Joseph High School, St. Joseph's Grammar School, St. Lawrence O'Toole School, and St. Mary's School.

schools, language schools, astrology schools, bartending schools, real estate schools, divinity schools, nursery schools, furniture finishing schools, radio schools, labor schools, beauty culture schools, mechanical arts schools, Swedish massage schools, secretarial schools, television schools, success schools, engineering schools, fencing schools, dancing schools, sewing schools, charm schools, dramatic schools, and finishing schools—to name but a few. Presumptively each of such private schools operates lawfully and furnishes instruction which to substantial segments of the population has some special value and desirability over and above instruction furnished in public schools. Some or all of the subjects taught in public schools could, of course, be included in the curriculum of the private schools, if the court deems that important as a basis for classification.

If the city of Piedmont is obliged by this court to permit petitioner to devote its property to private school purposes, in violation of the city's zoning ordinance, then the conclusion appears indubitably to follow that the city's doors must likewise be opened, upon demand of any other interested property owner, to any or all other private schools which in the manner of their operation are no more obnoxious to the public peace or quiet, or inherently unlawful, than the school herein authorized, all to the substantial, if not utter, subversion of the planned residential character of Zone A. Zoning ordinances permitting parochial or church schools but prohibiting other private schools in residential districts have been held arbitrary, capricious, and invalid in *State* v. *Northwestern Preparatory School* (1949), 228 Minn. 363 [37 N.W.2d 370, 371], and *Lumpkin* v. *Township Committee of Bernards Tp.* (1946), 134 N.J.L. 428 [48 A.2d 798]. Certainly this court cannot discriminate either in favor of, or against, a private school because of a religious affiliation or sponsorship, nor can this court properly undertake to censor or prescribe the curriculum of any lawfully conducted school, whether public or private. Freedom in the field of education is one of the basically protected rights (*Pierce* v. *Society of Sisters* (1925), 268 U.S. 510, 535 [45 S.Ct. 571, 573, 69 L.Ed. 1070, 39 A.L.R. 468]; *Meyer* v. *State of Nebraska* (1923), 262 U.S. 390 [43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446]), but this does not mean that a private school is, as to location, immune from the application of comprehensive zoning ordinances.

The majority opinion states, but does not attempt to answer, the cogent factors which may have moved the city council and the electors to approve the exclusion of private schools

from the residential zone. The very statement of such factors —the character of the district, the relativity of its surroundings, its school age population, the availability of other property, the conservation of property values, matters affecting traffic control, size of streets, parking, noise, fire protection, overburdening of water mains and sewers, and the peace, comfort and quiet of the district for residential purposes— demonstrates that reasonable minds might differ as to the necessity or propriety of the regulation, and that therefore there should be no judicial interference with the municipality's determination. That such factors are legitimate considerations in the establishment and maintenance of residential districts is not open to dispute, under the zoning principles established in this state. (See Gov. Code, § 38695, formerly Deering's Gen. Laws, Act 994, § 2; *Miller* v. *Board of Public Works* (1925), *supra*, 195 Cal. 477, 492-494; *Corporation of Presiding Bishop* v. *City of Porterville* (1949), *supra*, 90 Cal.App.2d 656, 659-661.)

Surely the inherent differences between public schools on the one hand and those privately operated on the other furnishes clear support for the application by the municipality of the factors enumerated above. For one thing, there are many more private than public schools; many are operated under religious and many under secular domination and the manner of their operation may be as varied as the subjects they teach. In *State* v. *Sinar* (1954), 267 Wis. 91 [65 N.W.2d 43, 47], the court in upholding an ordinance which permitted public schools and private elementary schools in a residential zone but excluded private high schools, pointed out that although public and private schools may perform like functions in some respects, nevertheless the public school serves the surrounding area without discrimination, whereas the private school, whether or not sectarian, does not. "The private school imposes on the community all the disadvantages of the public school but does not compensate the community in the same manner or to the same extent. If the private school does not make the same contribution to public welfare this difference may be taken into consideration by the legislative body in framing its ordinance." (P. 47 of 65 NW.2d.) Further, it appears that the elected Board of Education of the city of Piedmont, which is directly responsive to the people, is required to consult and advise with "the planning commission having jurisdiction of" property proposed to be acquired for new public school sites. See

Ed. Code, § 18403.) Standards for such sites are established by the State Department of Education. (*Id.*, § 18402.) No such control can be exercised by the city over the location of private schools, if it is compelled to grant petitioner the building permit here sought. Thus, another ground is shown for the reasonable exercise by the municipality of its right to determine zoning policy, and certainly one upon which a reasonable mind could say the regulation here in controversy is at least fairly debatable—and therefore not to be judicially overthrown.

*Irreparable Injury to Petitioner's*
*Business and Property*

The record shows that petitioner acquired the land concerned in July, 1954—some 18 years after[4] the amendment of the zoning ordinance to ban private schools from Zone A; the last prior owner of the land was The Roman Catholic Archbishop of San Francisco, a California corporation sole. The same corporation sole owns additional, adjoining, land on which ''are a Roman Catholic Church, and a rectory occupied by priests of said Church who serve Corpus Christi Parish in the Archdiocese of San Francisco of such Church.'' The school building which petitioner seeks to construct would have dimensions of 204 feet by 65 feet and an area of 13,260 square feet; in addition petitioner's land has an area of some 16,240 square feet ''which is available for incidental and/or school playground uses.''

Petitioner's land along its east boundary fronts upon the west side of Park Boulevard, all of which boulevard in that area lies within the corporate limits of the city of Oakland and *not* within the city of Piedmont. Adjacent to petitioner's land is a ''residential area known as 'St. James Wood,' which comprises approximately 227 building sites, all of which are restricted, by restrictions of record, to single family residences; the owners of said property have formed and are members of an association known as 'St. James Wood Homes Association.' If a witness were called for city of Piedmont he would testify that at a meeting of the members of said Association, held June 15, 1954, said members voted (170 to 2) objection to the granting of a permit for the building of petitioner's proposed school.''

It thus is shown that petitioner's land was acquired by

---

[4]See *Village of Euclid* v. *Ambler Realty Co.* (1926), 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016]; *Jones* v. *City of Los Angeles* (1930), 211 Cal. 304, 318-321 [295 P. 14].

it with advance knowledge that such land lies in a single family residential zone, and, further, that the adjacent land within the city of Piedmont is used for single family residential, rather than for private business, purposes. Under such circumstances no support is found for petitioner's assertion of ''irreparable injury'' to its business and property if it does not secure the private school building permit it seeks.

In *Wilkins* v. *City of San Bernardino* (1946), *supra*, 29 Cal.2d 332, 340, this court said that ''An examination of the California decisions discloses that the cases in which zoning ordinances have been held invalid and unreasonable as applied to particular property fall roughly into four categories: 1. Where the zoning ordinance attempts to exclude and prohibit existing and established uses or businesses that are not nuisances. [Citations.] 2. Where the restrictions create a monopoly. [Citations.] 3. Where the use of adjacent property renders the land entirely unsuited to or unusable for the only purpose permitted by the ordinance. [Citation.] 4. Where a small parcel is restricted and given less rights than the surrounding property, as where a lot in the center of a business or commercial district is limited to use for residential purposes, thereby creating an 'island' in the middle of a larger area devoted to other uses. [Citations.]''

Petitioner has alleged no facts showing, and makes no effort to support a claim, that the present case falls into any of the categories above listed, but merely alleges generally that ''Unless respondents are compelled . . . to issue to petitioner the permit which it has requested and, thus authorize the petitioner to construct, erect and establish its proposed school, petitioner's business and property will suffer irreparable injury.'' The law is settled, however, that ''The mere fact that some hardship may be experienced is not material, for '[e]very exercise of the police power is apt to affect adversely the property interest of somebody.' '' (*Clemons* v. *City of Los Angeles* (1950), *supra*, 36 Cal.2d 95, 99; *Zahn* v. *Board of Public Works* (1925), 195 Cal. 497, 503 [234 P. 388].) ''Where it is claimed that the ordinance is unreasonable as applied to plaintiff's property, or that a change in conditions has rendered application of the ordinance unreasonable, it is incumbent on plaintiff to produce sufficient evidence from which the court can make such findings as to the physical facts involved. as will justify it in concluding, as a matter of law, that the ordinance is un-

reasonable and invalid. It is not sufficient for him to show that it will be more profitable to him to make other use of his property, or that such other use will not cause injury to the public, but he must show an abuse of discretion on the part of the zoning authorities and that there has been an unreasonable and unwarranted exercise of the police power. [Citation.]'' (*Wilkins* v. *City of San Bernardino* (1946), *supra*, 29 Cal.2d 332, 338.) ''[I]t must be shown that there has been an unreasonable, oppressive, or unwarranted interference with property rights in the exercise of the police power before a zoning ordinance can be held invalid [citations] . . . The burden rests upon the plaintiff to establish the invalidity of the ordinance and its application to the property involved. The plaintiff's failure to sustain this burden raises a presumption of the existence of such facts as are sufficient to sustain the ordinance. [Citation.]'' (*Beverly Oil Co.* v. *City of Los Angeles* (1953), 40 Cal.2d 552, 559 [254 P.2d 865].)

If we conform to the principles above stated the writ sought should be denied.

Edmonds, J., and Spence, J., concurred.

Respondents' petition for a rehearing was denied November 23, 1955. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.