[Civ. No. 17796.  First Dist., Div. One.  Feb. 9, 1959.]

THE REDWOOD CITY COMPANY OF JEHOVAH'S WITNESSES, INC. (a Nonprofit Corporation) et al., Appellants, v. CITY OF MENLO PARK et al., Respondents.

Small & Werthimer and Hayden C. Covington for Appellants.

James T. O'Keefe, Jr., City Attorney, for Respondents.

ST. CLAIR, J. pro tem.*—This is an appeal from a final judgment discharging an alternative writ of mandate and denying the petition for writ of mandate. Petitioners sought by their petition to compel the issuance of a conditional use permit in order to build a church in the defendant city pursuant to the provisions of the city's zoning ordinances. An order directing the issuance of an alternative writ of mandate was issued. A motion to strike certain parts of the petition

*Assigned by Chairman of Judicial Council.

referring to the defendants in their individual capacities was granted limiting the case against defendants to their official capacities.

The defendant city of Menlo Park is a general law city, duly organized and existing under the laws of the State of California. It has a planning commission composed of seven voting members, and a city council composed of five elected members.

Petitioners, the Redwood City Company of Jehovah's Witnesses, Inc., is a California nonprofit corporation organized for religious purposes. It is the owner of a parcel of real property located near the Willow Road overpass between Bay Road and Exit Road in the city of Menlo Park. Title to the property was acquired on April 17, 1956. The property is located in the R-1-U (Urban Residential) zone classification of the city, as provided for in City Ordinance Number 228. The sections of the city zoning ordinance pertinent to this case read as follows:

"Section 9:

"3. R-1-U: Single Family Urban Residential District.

"(a) Uses Permitted:

"(1) All uses permitted in the RE land use district, subject to review and approval by the Planning Commission and the obtaining of a use permit for any use for which such permit is required in RE district."

The ordinance provides with reference to RE districts:

"Section 9:

"E . . .

"1. . . .

"(a) Uses Permitted: . . .

"(2) . . . churches, . . . all subject to review and approval by the City Planning Commission and the obtaining of a use permit in each case. Said use permit, review and approval will take into consideration location and provision for adequate off-street parking, as such off-street parking is required by this ordinance in the C-3 Commercial Land Use District, architectural control review as provided in Section 9C of this ordinance, such review to be concerned particularly with tree, shrub planting and landscape treatment to preserve the beauty and charm of the City and the residential character of the land use district in which said use is located."

The applicable section pertaining to off-street parking provides,

"(2) Off-street parking: Off-street parking to be provided through public parking areas developed to serve district as a whole; where such public parking is not available, off-street parking as required in the C-2 land use district shall be provided by the developer. *Further, there shall be provided one parking space for each ten (10) seats in any ... church ...* provided that public off-street parking space located within 200 feet by the most direct route via public streets of any place of public assemblage may be included for the purpose of determining the adequacy of parking space in conformity with this provision, *providing further that such space is available and adequate to the activity in question.*" (Italics added.)

The ordinance's preamble sets forth the purposes for its adoption. These purposes include the desire to provide for ease of access as between land use areas; the designation, regulation and restriction of parking; the lessening of street congestion; the preservation and extension of the inherent residential character of the city and the promotion of health, safety, comfort, convenience and the general welfare of the city. (§ 4.)

Section 20 of the ordinance provides in part:

"In interpreting, applying and enforcing provisions of this ordinance, they shall be held to be the minimum requirements adopted for the promotion of the public health, safety, comfort, convenience and general welfare."

Section 13 provides in part:

"A. In granting any use permit, the Commission may require such conditions to use as may be deemed reasonable to preserve the health, safety, welfare, prosperity and inherent residential character and beauty of this City."

Section 14 provides for appeals:

"H. Appeal. The Commission shall have power to hear and decide appeals involving the enforcement of this ordinance by the Building Department when such appeals are based upon questions of the interpretation of said ordinance, and the Council shall have power to hear and decide appeals from the decision of said Commission on the same questions."

Petitioners requested a building permit to construct a church on the lot in question. The plot plan involved in this appeal shows that the church will have a total of 140 seats and 14 off-street parking places, each 17 feet by 8 feet, located at the rear of the property. An aisle to be used as a lane of approach is provided between each row of stalls. The

exit from the parking area is 15 feet wide. By stacking cars in the aisle between the parking stalls a total of 24 cars could be parked on the lot.

Petitioners' first application for a use permit was heard on April 2, 1956, by the planning commission. The plan was submitted to the traffic safety commission for a recommendation and the hearing was continued. On May 7, 1956, a further hearing was held at which time the traffic safety commission's recommendation was received and the use permit denied.

Petitioners redrew their application, receiving some help from the commission and the staff in redesigning the church and the parking facilities.

On June 4 petitioners' second application for a use permit was set for hearing. On July 2 the traffic safety commission's second recommendation was read and considered. The report stated: "2. The commission then viewed the site plan of the Jehovah's Witnesses Hall on Bay Road which will come before the planning commission for public hearing on July 2d. This is a new site plan submitted by the congregation. The commission felt the parking layout was technically adequate and that having access only on the frontage road was far better than using Bay Road for automobile ingress and egress. Thus the commission could not find a hazardous condition resulting from the parking arrangement as shown. However, the commission felt that more land area would be extremely desirable for such a church site." One of the commissioners stated that he felt the area was too small but as petitioners had met the parking space and set-back requirements there was no option but to grant the permit.

The planning commission granted the use permit and architectural control approval was given.

On July 10 an appeal was taken from the planning commission's decision. A hearing before the city council was set for August 14 at which time it was continued to August 28 in order for the city engineer to study the plan and make a report. On August 28 the hearing was continued to September 11 for production of further evidence by the protestants.

At the September 11 hearing there was considerable evidence produced by those opposed to the granting of the permit. Most of it was aimed to show that 14 cars could not readily be parked in the proposed 14 stalls. Not much evidence was produced by the proponents at this meeting but

the minutes thereof (in evidence) show that the city engineer of Menlo Park gave as his opinion that the parking stalls, and the spacing thereof, met the requirements of the ordinance.

Running through said minutes and through the record of the trial is an attitude that the ordinance itself is inadequate; that there should be a requirement of more than one stall to every 10 seats; that the ordinance, as written, is obsolete and should require many more stalls per unit of seats; that more cars should be restrained from on-street parking.

The minutes of the September 11 meeting read, in part: "Councilman Burgess thought it difficult to say Yes or No. He feels as Mayor Ford does, that the lot is too small. The Traffic Safety Commission had misgivings as to the size of the lot and he feels the Ordinance does not quite meet the requirements, the Ordinance is inadequate. The parking spaces are at a minimum and he is fearful that many cars will not park there because of the difficulty in parking. He asked the City Attorney if the Council will have to adhere strictly to the present Ordinance.

"The City Attorney informed him that the zoning now permits churches, the Council is to determine what the Ordinance prescribes now. If the parking spaces are usable spaces, although minimum, this is a compliance with the Ordinance. If there is technical compliance the Council must act accordingly, it cannot take anticipation that the Ordinance is not now adequate.

"Councilman Bonde stated that his sentiments are with Councilman Ford. He thinks an additional parking problem will exist and will be detrimental to the neighborhood.

"Councilman Burgess remarked that although the usability of the space on parking meets the requirements, yet parking will be on the streets, and he feels that unless they can come up with additional parking space the Use Permit should be denied.

"Moved by Councilman Bonde, seconded by Councilman Burgess, 'that the application of Jehovah's Witnesses for a Use Permit to construct and maintain a church and/or a hall on Lot 9, Block 2, Newbridge Park in the City of Menlo Park be denied and the action of the Planning Commission with respect to said application be overruled, in that the City Council hereby finds and determines that the off-street parking facilities are inadequate and will present a traffic problem, and in that said City Council hereby finds and determines

that the establishment, maintenance and/or conducting of the use, on the premises above described, will under the circumstances of this particular case, be detrimental to the health, safety, comfort, convenience or welfare of persons residing or working in the neighborhood of such use and will, under the circumstances of this particular case, be detrimental to the public welfare or injurious to property or improvements in said neighborhood and will have an adverse effect on the inherent residential character and beauty of the City.'

"Roll call: YES —Councilmen Bonde, Burgess, Ford.

NOES—Councilmen Andrus and Lawson."

As was proper, at the trial the evidence before the council was, in the main, reproduced. For reasons which will become apparent, we have carefully searched the record for any and all evidence, other than the size and the efficiency of the parking lot, that would or could bear on "the public health, safety, comfort, convenience and general welfare" or that would be "detrimental to the public welfare or injurious to property or improvement in said neighborhood," these being the alleged standards laid down by the ordinance, over and above the standard of one parking space per 10 seats.

The record shows that there were petitions circulated and signed protesting the granting of the use permit but such petitions are not a part of the record.

The petitioners put in evidence a traffic count of cars passing the plot in question at the hours and the day and week in which the church would be used. Presumably in answer thereto the protestants put in evidence that additional residential area, north or west of the proposed plot, would in the future be opened up, thus increasing the area which might feed traffic past the church. Against this petitioners put in an expert who counted the houses in the area that *now* or in the future might create traffic past the church. He came up with an opinion, "I do not believe that even in the next 20 years the volume of traffic on Exit Street will be any more than it is on a normal street; may be 1000, 1500." (He was referring to trips per day past the church property.) Exhibit 27 had shown a count of 2,265 cars on both Exit and Bay Roads.

There is much mention in the record of a traffic handbook and one councilman testified that they relied on the book. However, the reliance was apparently limited to matters concerning the make up of the parking lot itself.

There was evidence by the protestants of a check in a situation in the city of Los Altos that was alleged to be similar to the instant one. The check showed that there was a ratio of two cars per seat in church. "I felt that the parking ratio of one to 10 was not a realistic figure and that was my purpose in making this count."

Councilman Burgess testified: "My action was based upon the belief that the parking space as laid out, while they would produce the 14 parking spaces required by the Ordinance, would, as a matter of practice, not be used by 14 cars because of a practical difficulty in parking in that—in this particular layout. To explain the background a little further, our Ordinance—the requirements of our Ordinance are certainly minimum. The new Church of the Latter Day Saints, for instance, complies with our off-street parking with much to spare, and yet we note that there are lots of cars parked along Valparaiso. And I had felt that the intent of the Ordinance is that there be a minimum of 14 cars, or one per 10 cars parked in this off-street parking to reduce the on-street parking, and that if we had a situation which was minimum in every respect, where people actually would not wish to park in it, or because of the great care and difficulty in parking, that we would not actually achieve the intent of the Ordinance, and that was the basis for my vote. I felt that the plan did not comply with the Ordinance because the parking spaces, while usable, as a practice might not be used, thereby throwing more cars on the on-street parking and resulting in traffic problems and a detriment to the neighborhood. Q. Well, then, I take it in addition to discussing and thinking on the question of the minimum of one to ten seats for parking, you also took into consideration the effect that that plot would have on forcing parking on the street? A. That is just part and parcel of the fact. Q. Yes. A. Every car that does not park in that parking space will be parked on the street at some point. Q. You took into consideration the effect this would have traffic-wise and otherwise on the conditions in the neighborhood, is that right? A. That is right, because the cars would be parked in the neighborhood if they could not be parked, or were not parked in the parking area. Q. Did you take into consideration, and I assume that you did, the peculiar shape of this property and the small size of it? A. That, of course, is the basic—the basic problem that causes the difficulty. Q. What, the size of it? The small size? A.

The small size prevents the—prevents sufficient turning space in the parking lot to—to get the required number of cars in, on top of which, of course, the peculiar nature of that area, where you could park only on one side of the Access Road. —If you parked on both sides, it would block traffic—means that the cars would be parked away from this triangle—would be parked in one direction up into the neighborhood from which most of the protests came. Q. In other words, you took into consideration also, I take it, the Access Road; the location of it; the use of it; and the intersecting streets, all these residential streets going north? A. Yes. Q. Is that right? A. Yes. Q. You took into consideration, did you, the fact that once you leave this property, you turn right into the end of the triangle and up into the interchange where there couldn't be any parking? A. That is right. I felt that the requirements of the Ordinance were minimum, and, therefore, we should be sure that we got at least the minimum cars off of the street because of the nature of the surrounding area.''

There is one other very pertinent fact. There are other churches in the same or similar residential districts in Menlo Park, built under use permits similar to the one herein sought by petitioners.

The trial court in denying petitioners' application for a writ of mandamus found that the action of the city council was not arbitrary, capricious or based upon whim or fancy and did not deny petitioners their constitutional rights to freedom of worship, nor was their action without sound and good reason in fact or in law but was based upon sound and good reason in fact and in law and said action was in good faith and based upon sound discretion.

*Appeal from Order Granting Motion to Strike*

The notice of appeal states an appeal from the judgment and ''from the motion to strike and from all adverse orders preceding said judgment or upon which said judgment is based.''

The order in question struck all reference to the members of the city council in their individual capacity and certain portions of the petition, by page and line.

No mention was made of this order, either in petitioners' brief or at oral argument. We assume petitioners have abandoned this portion of the appeal.

### Is the Constitutionality of the Ordinance at Issue, Here?

In their petition for writ of mandate, petitioners allege full compliance by them with the requirements of the ordinance to entitle petitioners to a use permit; that the decision of the city council denying them a use permit was arbitrary, capricious and without sound or good reason in fact or in law; that petitioners had been denied their constitutional rights and freedom of worship as guaranteed by the Constitution of the United States and of California.

In petitioners' opening brief, page 44, they say: "The appellants contend that it is the order of the Council that has deprived them of their constitutional rights. This contention is not that the ordinance is void or that any part of it is illegal on its face. The position of appellants is that the law is unconstitutional as construed, applied and enforced by the Council. The constitutionality of the law is to be determined according to the particular facts of the case."

Later on, at page 51, they say: "The only question involved is whether there has been an arbitrary and capricious denial of the permit."

Although the above would seem to make petitioners' position quite clear, at the oral argument, under questioning from the bench, counsel for petitioners took the position that if they lost on the point of capricious action of the council, they should be permitted to attack the constitutionality of the ordinance.

As permitted by the court, both sides filed supplemental briefs. As we read petitioners' supplemental brief, they are still only contending that the *action of the council* raised a constitutional question. We agree that such a question is raised.

Defendants read petitioners' supplemental brief to raise the question of the constitutionality of the ordinance itself and defendants' supplemental brief addressed itself to that question.

In their letter transmitting their supplemental brief, petitioners concede that in California the rule is well established that the theory on which the case was tried is the theory in the appellate court, citing cases and 3 Witkin, California Procedure, page 2264.

We hold that the matter under review is the result of the impact of the action of the city council on the constitutional and statutory rights of petitioners and does not involve the constitutionality of the ordinance itself.

*Did the Petitioners Comply with the Off-Street Parking Requirements?*

The first matter to be determined is whether or not petitioners are correct in their assumption that they met the requirements of the ordinance as to off-street parking. Section 9-12, C-3 of the ordinance, *supra,* provided that "there shall be provided one parking space for each ten (10) seats in any . . . church . . ." It is obvious that petitioners complied with the literal language; 14 parking stalls to serve 140 seats in the proposed church.

The protestants made a determined attack on the proposed parking space to show that it would not hold 14 cars. From the questions put by counsel at trial and from the briefs it would appear that defendants consider the last clause of said section 9-12, C-3, to wit, "providing further that such space is available and adequate to the activity in question" as referring back to phrase "there shall be provided one parking space for each ten (10) seats." However, when we parse the sentence, it is clear that the reference is to the "public off-street parking space located within 200 feet . . . of any place of public assemblage . . ."

Without regard to the nonapplicability of the referred to clause, it would appear proper for the council to examine a proposed parking space to see if it had what the ordinance called for. The relevancy of the grammatical problem is that, under our parsing, there is no standard laid down, whatsoever, to guide the council in determining what kind of parking space is required.

A fair résumé of the evidence as to the efficiency of the parking lot is that (1) 14 miscellaneous cars could be parked therein; (2) it would be difficult for 14 large cars (such as Cadillacs) to be parked therein; but (3) very easy for 14 small foreign cars so to do. In addition, it was uncontradicted that by "stacking," 24 cars could be parked in the area. There is no standard laid down that would stop an applicant from offering parking spaces that required "stacking."

We believe, in all fairness, that it must be said that petitioners complied with section 9-12, C-3 of the ordinance. This holding is buttressed by the fact that the city engineer, the city planning commission and the city attorney were all of the opinion that petitioners had technically complied with the off-street parking requirements of the ordinance.

■■■ *Was the Action of the City Council Arbitrary and Capricious?*

It is worth repeating, here, that the only standards set up in the ordinance, other than the ratio of off-street parking places to seats in the church are contained in the general phrases "the public health, safety, comfort, convenience and general welfare" and "detrimental to the public welfare or injurious to the property or improvement in said neighborhood."

In *Roman Catholic etc. Corp.* v. *City of Piedmont*, 45 Cal.2d 325, at page 332 [289 P.2d 438], the court said: "While on the facts, many of the cases may be distinguishable, the reasoning which leads to the conclusion that an ordinance is invalid which excludes private schools from an area in which public schools are found is persuasive. It is difficult to make an argument that private schools are inimical to the public welfare while public schools are not."

In the instant case, it is difficult to make an argument that one church that complies with the ordinance assists the public welfare while another that likewise complies, is inimical thereto. It is also difficult to believe that a court would sustain a finding that a church would be detrimental to the morals of a community or, except as to the traffic problem, would be adverse to the community's health, safety or comfort.

As indicated above, the ratiocination of most of the witnesses seemed grounded in a belief that the ordinance in question was inadequate. One witness seemed to be arguing that a ratio of one parking space to two seats was proper.

The difficulties in which the defendants find themselves here, are based on the fact that there is no standard or rule to govern the issuance of use permits to churches that have complied with the off-street parking requirements other than general phrases. It is true that the modern trend is to give wide discretion to municipalities in zoning matters, but in this case the only definitive standard the ordinance laid down was the one with regard to traffic matters, to wit, one off-street parking space for each ten seats in the proposed church, with which the petitioners have complied. The "standards," over and beyond the last mentioned, are only the general phrases heretofore quoted from section 20 of the ordinance.

■■ McQuillin lays it down as a fundamental rule in zoning as well as other matters that an ordinance must establish a standard to operate uniformly and govern its administration

and enforcement in all cases, and that an ordinance is invalid where it leaves its interpretation, administration or enforcement to the ungoverned discretion of the administrative agency. (8 McQuillin, Municipal Corporations, 3d rev. ed., p. 137, § 25.62.)

■ Where an ordinance lays down certain standards or requirements (in this case the requirement of one parking space for each ten seats), the rule appears to be that in adopting zone classifications with terms, standards and requirements pertinent thereto, the city exhausted its discretion as to standards. (*State* ex rel. *Ogden* v. *City of Bellevue*, 45 Wn.2d 492 [275 P.2d 899].)

■ It may well be, as argued, that the standards or requirements of off-street parking are inadequate but we are not concerned therewith. Furthermore, the city council of Menlo Park was acting in a nonlegislative capacity when acting on petitioners' application and was bound by the terms of the ordinance until it is amended by appropriate legislative action. (*Johnston* v. *Board of Supervisors*, 31 Cal.2d 66 [187 P.2d 686].)

The judgment is reversed with instructions to the trial court to issue the writ as prayed for.

Peters, P. J., and Bray, J., concurred.